ESTATE OF KOCH.    (Two appeals.)

*December 5, 1911—March 12, 1912.*

(1–12, 14–19) *Guaranty: Rights and duties of sureties: Contribution: Remedies, legal or equitable: Court and jury: Implied contract: Parting with right by contract: Breach of duty: Means of preventing loss: Quasi-trust: Constructive fraud: Security: Negligence: Evidence: Presumptions: Corporations.* (13) *Appeal: Affirmance and reversal.* (20–24) *County courts:' Executors and administrators: Claims against decedent: "Adverse party:" Heirs: Guardian* ad litem: *Waiver of irregularities: Appeal: Notice.*

John C. Koch, Henry A. Koch, and another, owners or controllers of all stock of a corporation, guaranteed certain of its liabilities.    Later such other became insolvent and dropped out. Later John C. bought Henry's interest on the basis of there being corporate assets over general liabilities of $77,500, the guaranty, as later claimed on the side of John C., not being mentioned, but, as claimed by Henry, being wholly assumed as between the two by John C.    Some two years later John C. died, having till then controlled the corporation.    Soon it was declared a bankrupt and found with assets only equal to about fifty per cent. of general liabilities.    On behalf of John C.'s estate $35,272.55 was duly paid on the guaranty, and a claim therefor was proved in bankruptcy and compromised at less than half, Henry consenting without knowledge of a special benefit to the estate of $6,500.    To his claim for balance due from John C. on the stock, the personal representative pleaded for contribution on the guaranty.    The former pleaded an express extinguishment of the right in that regard, and loss of it through breach of duty as to the special exaction.    Such plea was not sustained in county court but was on appeal.

A minor interested was permitted to appear in county court by guardian *ad litem*. The personal representative in appealing did not serve notice on such guardian. The appellate court permitted any irregularity in that respect to be, and it was, waived, so far as the guardian was competent to do so. The facts suggested were found on the appeal, except the pleaded surrender of the right of contribution and intent to defend as to the secret exaction. They were negatived. There were no specially found or pleaded facts, except as stated. The court found, generally, that contribution should be denied. The following rules apply:

1. There is, in general, a right to contribution between co-sureties, not a mere privilege to be extended or not in judicial discretion.

2. Such right anciently originated in equity but now rests upon legal as well as equitable obligation and is enforceable at law or in equity according to circumstances.

3. Since such right depends upon established legal and equitable rules, given a situation within them, and a remediable right exists as matter of course.

4. The right being grounded, as indicated, upon the facts being found by court or jury, the former must apply the law, vitalizing the remediable character of such right.

5. The right of contribution between cosureties was given remediable character in equity with correlative rights, duties, and obligations in harmony with the rule that he who asks, must do equity,—in all constituting an entirety with natural dependable elements, fixing limitations and conditions.

6. The system established as indicated in No. 5 is now as obligatory on individuals in business relations, as any rule of action prescribed by written law, and regarded as automatically incorporated into every contract of guaranty, nothing appearing to the contrary, though not mentioned in its letter, and any breach thereof falls within the field of legal or equitable remedies, or both.

7. Such right, inchoate in character, exists from making the guaranty, rests in implied contract, and takes remediable character upon overpayment by one of his legal or equitable share of loss.

8. Such right being a creation of contract, may be contracted away, or lost, by a surety, in whole or in part, violating some duty owing by him to his cosurety.

9. A breach, by one surety, of his duty to his cosurety, causing loss to the latter, to that extent, is a legal and equitable defense in his behalf against any claim of the former for contribution.

10. Inhering in a joint contract of guaranty is an implied

mutual agreement that any special means of immunity from, or indemnity for, loss acquired by either surety shall be held and used, reasonably, for the common benefit of the bearers of the common burden.

11. A surety having control of means, as indicated in No. 10, is a *quasi*-trustee thereof for his associates with all incidental duties.

12. The right of contribution may be parted with by implied as well as by express contract, and the latter may be established circumstantially as well as by direct proof of contract stipulations.

13. A judgment,—right on facts found expressly or inferentially, or clearly established by competent evidence or evidence not excepted to, though not found at all or the facts pleaded,— will not be disturbed on appeal, since the real right is the end sought,—that appearing satisfactorily, it will prevail however irregularly or illogically, so long as not prejudicially, embodied in the judgment.

14. If a surety secures consent of his cosurety to a compromise of their joint claim against the principal obligor, without disclosing an advantage obtained in the transaction, the failure to disclose being without actual intent to defraud, he is guilty of constructive fraud, and is liable to share in some proper way the advantage with such cosurety.

15. If one of several sureties, all being owners, directly or indirectly, of the business and property which is the primary security for discharging the guaranty, buys the interest in such business of a cosurety at its net value, he does not, necessarily, by that, alone, lose his right of contribution against the vendee, nor does his subsequent failure to protect the security in case of continuing to control such primary security, constitute, necessarily, a wrong, forfeiting his right of contribution.

16. A purchase in the circumstances stated in No. 15 is strongly evidentiary, though not conclusive, of an understanding that the vendee shall not, as between the two, be held liable upon the guaranty.

17. In such circumstances, if the vendee continues to control the primary means for protecting the guaranty, he owes to the vendor the duty of exercising reasonable care to that end.

18. In the circumstances of No. 17, proof of loss of the primary security within such time and under such conditions as to raise an inference of negligent performance, or disregard of the cosurety duty, there being no explanation thereof, shows, *prima facie*, fatal negligence, forfeiting the right of contribution.

Estate of Koch, 148 Wis. 548.

19. If A. and B. are substantially owners of all stock of a corporation, and joint sureties on a guaranty of its indebtedness, or part thereof, and A. buys B.'s stock, under such circumstances as to suggest a mutual understanding of there being a substantial excess of assets over general and stock liabilities, giving or contracting to give, pursuant thereto, full value for the stock, and A. thereafter controls the corporate assets, and, shortly, such assets are found not nearly sufficient to pay the general indebtedness, and there is no satisfactory explanation thereof, the presumption arises that he is guilty of having, through negligence or fraud, breached his duty to the corporation and his cosurety, which is fatal to any claim in his behalf against B. for contribution on account of payment of the guaranteed indebtedness.

20. In a hearing on claims in probate court, an heir is not an adverse party, in the practice sense,—the personal representative is such party as to the claimant.

21. Notwithstanding No. 20, an heir of the deceased may be permitted to appear, personally or by attorney, in such a hearing to protect his remote interest.

22. In case of permission as in No. 21, an heir is not an adverse party, in respect to an appeal from probate court, on which notice must be served.

23. A guardian *ad litem*, in judicial proceedings, may waive a mere irregularity therein, by permission of the court.

24. Filing of notice under sec. 4031, Stats. (1898), is the prime essential to appeal from a decision by the county court,— subsequent steps are of such minor character as to be waivable.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Affirmed.*

Proceedings involving the right of contribution between cosureties.

Three persons, John C. Koch, deceased, *Henry A. Koch,* the respondent, and one Loeber, signed a guaranty of certain debts of a corporation in which all were stockholders. Subsequently, one became bankrupt and later a second bought the stock owned by the third, giving his promissory notes therefor. Later the vendee died, not having paid his notes, and leaving, as part of his estate, a controlling interest in the stock. Substantially all the balance of the stock belonged to his sons.

The estate was compelled to pay a large sum on the guaranty. Plaintiff made a claim against the estate for the amount due on his notes. The administrator for an offset, pleaded that the claimant was liable for his due proportion of the sum paid on the guaranty. Such offset was allowed in county court. It was disallowed on appeal to circuit court.

There was evidence offered to show the following: When the deceased took the stock of his cosurety there was property enough to pay off all the corporate liabilities, including liabilities to stockholders, and leave a surplus equal to seventy-five per cent. of the stock. After the purchase the deceased owned substantially the whole corporate property, so far as ownership of stock would accomplish that, and either he, or he and his children, so continued for some three years till he died. The property during this time was so dissipated that soon the corporation was duly declared a bankrupt and proved to have assets sufficient to pay less than fifty per cent. of the ordinary liabilities, leaving nothing for the stock. When deceased acquired such stock he promised, as a part of the transaction, that he would save the vendor harmless from the guaranty. The facts found by the court covered all these matters and others. The following is a summary thereof, omitting formal parts:

1. In 1887, John C. Koch, deceased, his brother, the plaintiff, and one Loeber formed a $50,000 stock corporation, the shares being $100 each, under the laws of Wisconsin, it being a family affair.

2. May 1, 1895, while deceased, plaintiff, Loeber, and a sister of the deceased owned all the stock, the first three signed a guaranty of the debts of the corporation, which continued in force till after payment thereon as hereafter mentioned, Loeber becoming in the meantime insolvent.

3. December 4, 1905, all the stock of the corporation was owned as follows: Deceased 260 shares, plaintiff 200 shares,

the corporation 30 shares, estate of the sister, deceased, 10 shares.

4. At such time deceased took over plaintiff's stock at the supposed and agreed value of $175 per share, giving therefor ten promissory notes of $3,800 each, payable one each year with six per cent. interest, at which time the amount of the guaranteed debts was $47,600.

5. At such time there was no express agreement or understanding that as part of the consideration therefor the vendee would protect the vendor as to the guaranty.

6. The death of John C. Koch occurred November 8, 1907, and February 4, 1908, plaintiff filed his claim in the settlement proceedings of the estate for $36,000, the amount due on the notes.

7. Shortly after deceased took over the stock, as aforesaid, he transferred 100 shares to each of his two sons, leaving in his own name 260 shares. Such ownership continued without further change till the death occurred as stated, and the corporation was duly adjudged a bankrupt in the federal court, which occurred in May, 1908.

8. After paying a dividend of five per cent. a composition settlement was had in the bankruptcy court of the balance of the indebtedness for forty cents on the dollar.

9. Prior to the adjudication in bankruptcy, the estate of John C. Koch was compelled to pay on the guaranty $35,272.55, for which a claim was duly filed in the bankruptcy proceedings, and on which the administrator received the five per cent. and the composition forty per cent., he joining in the latter proceedings with the approval of plaintiff,— leaving unpaid $20,101.61.

10. The administrator exacted, as a condition of joining in the compromise, that those promoting it should take over the corporate stock owned by the estate, paying therefor $6,500, which was done; plaintiff being ignorant thereof

though it was duly reported to the county court before being consummated and was duly approved.

11. The administrator did not make any false representations in respect to the matter aforesaid, or fraudulently omit to disclose anything to plaintiff.

12. December 9th there was left due on plaintiff's notes aforesaid $10,050.80 with interest from August 11, 1908.

On such facts the court concluded as matter of law that it would be inequitable to compel plaintiff to share in the loss caused by payment upon the guaranty, and that he was entitled to judgment accordingly, reversing that of the county court in part and giving him an absolute recovery against the estate of the deceased for $10,050.80, with interest and costs. Judgment was so rendered.   [From that judgment an appeal was taken by *Charles E. Wild,* administrator with the will annexed of the estate of John C. Koch; also an appeal by the guardian *ad litem* of *Gretchen Ullrich,* a minor heir, legatee, and devisee under the will.]

For the appellant *Wild* there was a brief by *Flanders, Bottum, Fawsett & Bottum,* attorneys, and *James G. Flanders,* of counsel, and for the appellant *Ullrich* a brief by *J. O. Carbys.* The cause was argued orally by *James G. Flanders.*

*Frank M. Hoyt,* attorney, and *Thomas M. Kearney,* of counsel, for the respondent.

The following opinion was filed January 9, 1912:

MARSHALL, J.   The judgment must be affirmed. Not because it is grounded upon altogether legitimate logic; but because it is right.

Compulsory contribution between cosureties does not rest in mere equity though, true, such is the origin of the law. The individual chancellor cannot, as an original proposition, do in each case what he may think will fit the facts from the standpoint of justice in the abstract.   He cannot merely seize upon his ideal in the moral sense and vitalize it by a decree.

That would make contribution depend on arbitration in the habiliments of judicial administration. Contribution is dependable upon pretty definitely established legal rules, applicable to situations which may vary greatly as regards facts, but fall into pretty well defined general classes. The facts, dependable upon concession or evidence, or both, being found, the class and result are governed by the law. The court is to apply the law as it is given, not make it for the found situation. True, originally, there was a mere doctrine of contribution. True, like a great body of our law, it originated in judicial administration, unguided by written law or any rule, or anything but the chancellor's sense of justice and conception of means to effectuate it.

Doubtless, "sense of right developed sense of duty." Continuing the logic; sense of duty developed sense of moral obligation; sense of moral obligation, intensified by contemplation of the mischiefs incident to its violation, developed sense of necessity for compulsory responsibility; the latter developed sense of need for remedial justice. At that point of growth progress waited for its crowning effort. There was no written law to meet the case; none was offered. Then the boundless source of instrumentalities for coping with human transgressions, with its ready means, or power of invention thereof, for reparation of every wrong above mere moral infractions best dealt with by one's own conscience and sensibility to the rewards and punishments afforded by social environment; a source as limitless and fruitful as man's capacity to wrong his fellow men; that one in which has originated more of the beneficial regulations of human conduct found in the scientific ethics of the law, than in all the legislatures of a century,—equity, vitalized by its human conscience, furnished the needed remedy, recognizing the primary right, duty, and obligation with an environment of correlative rights, duties, and obligations, in all an entirety with mutually dependable elements fixing limitations and conditions.

The thought was that joint sureties, nothing appearing to the contrary, must naturally expect to share the burdens assumed, on a basis of equality and, as equality means equity, it was competent to enforce it in chancery. In such enforcement there was necessity for consistency, recognizing the universal rule that he only has enforceable equity who does equity. This latter was important, since it was seen that the ground of equity upon the one side raised the duty upon the other to share equally any advantages obtained, directly or indirectly, from the principals, as regards immunity from, or indemnity for, risk, and to use other advantages, such as actual control of the source for discharge of the principal obligation, with reasonable care and for mutual benefit.

So from the very nature of the matter the whole subject of contribution was at first and for a long time dealt with solely in equity, taking, however, more and more, with the lapse of time, the form of a definite judicial code, appropriate to a proper standard, in moral conception, of business ethics. Those rules, being well established and universally applied with quite as much certainty as legal rules, strictly so called, or rules dependable upon written law, came to be regarded as automatically written into every contract of guaranty, nothing appearing efficiently to the contrary, and enforceable at law as well as in equity.

Now the logic of the enforceability of contribution, at law as well as in equity, is that there is a real right of contribution growing out of the relations of the parties, not a mere privilege to be extended or not in judicial discretion. The right may be contracted away or lost by violation of some correlative right, but it is not within the province of the court, as an original matter, to give it or to take it away. The right, inchoate, has its inception at the time of signing the guaranty. It sleepeth, so to speak, till aroused into life, by compulsory payment by one of more than his share of the loss. Upon others refusing to make good, there is a violated right creat-

ing a cause of action of legal or equitable cognizance, or both. That cause of action is defendable against by a violated right, in case of there being any; having regard to the equitable duties of the parties to each other as established in the law, and in contemplation of which they are presumed to have agreed in joining in the guaranty. The idea is not that any express contract exists between cosureties upon which an action will lie, but that there is a contract implied, growing out of the relations of the parties,—a contract which is contemporaneous with the signing of the guaranty, not which springs up by overpayment by a surety. The latter merely fixes the right in accordance with the implied contractual obligation made at the start, that the solvent resident guarantors will share equally any loss resulting from the suretyship.

Said this court in *Hardell v. Carroll,* 90 Wis. 350, 63 N. W. 275, quoting from a standard author:

"The right of contribution is an equity which springs up at the time two or more persons assume as to each other the relation of cosureties for a common principal, and ripens into a cause of action when one of the sureties pays more than his proportion of the debt for which all were liable."

While it is an equity the right to the equity is legal as well as equitable, because the parties are presumed to have agreed that the right shall exist, and so legal as well as equitable remedies are available to redress its violation. *Mason v. Pierron,* 63 Wis. 239, 23 N. W. 119; *Bushnell v. Bushnell,* 77 Wis. 435, 46 N. W. 442; *Faurot v. Gates,* 86 Wis. 569, 57 N. W. 294; *Boutin v. Etsell,* 110 Wis. 276, 85 N. W. 964; *Fanning v. Murphy,* 126 Wis. 538, 548, 105 N. W. 1056.

"The liability of a surety to contribute to one who has paid more than his share of the common debt, is one that is now recognized and enforced both at law and in equity."

"The time was that the paying surety in an action could only recover from his cosurety an aliquot part of the whole debt; regard being had to the number of sureties, and without regard to the insolvency or nonresidence of any of them. The

considerations before mentioned induced a modification of this rule, so that it may be said to be established law in this state, as well as others, that, when one surety has paid the whole debt, he may compel contribution from such of his cosureties as are solvent and within the state." *Boutin v. Etsell, supra.*

"In contemplation of law, the act" of payment by a surety, the principal having defaulted, "is characterized by a request from the cosurety, if there be such, to the one acting in the matter to pay the debt, and a promise on the part of the former," implied from the obligation assumed to have been entered into at the start, "to contribute his proper proportion. Thus a cosurety is liable to contribute to the one making the payment, both upon the ground of equitable and legal obligation." *Fanning v. Murphy, supra.*

As before indicated, the right of contribution may be parted with to cosureties by contract, or lost to the extent that prejudicial breach of duty to the cosureties would otherwise proximately cause loss to them, and may be forfeited in some other ways definitely established in the law.

Consistent with the principle that each surety, impliedly, by joining in the guaranty, contracts not to take any special advantage, growing out of means of immunity from, or indemnity for, loss, secured from the principal during the existence of the contract of guaranty, and to reasonably conserve for the common protection property of such principal under his control, forming a legitimate means of such protection, it has been held as follows: Where a surety bought in the principal claim at a discount he can only claim contribution as to the amount paid. *Tarr v. Ravenscroft,* 12 Gratt. 642; *Derosset v. Bradley,* 63 N. C. 17. A surety who pays in depreciated currency can only have contribution on the basis of its value, such currency not being a legal tender. *Edmonds v. Sheahan,* 47 Tex. 443. A surety who receives security from his principal, although the latter intends it specially for the individual benefit, is required to apply the same for the benefit of all. *Fuller v. Hapgood,* 39 Vt. 617, 620.

A cashier of a bank in which a principal obligor is a depositor who is an associate surety for a liability of such principal, having received a check from such principal on his account in the bank to discharge such obligation, which he negligently for some days omits to efficiently use by transmitting the money as requested, and in the meantime the bank fails, causing the principal debtor to make default,—is, by reason of breach of duty to his cosureties to use his special knowledge of the situation and instrumentalities placed in his hands to protect all, liable, as between them, for the entire loss. *Crisfield v. Murdock,* 127 N. Y. 315, 27 N. E. 1046. A cosurety who receives indemnity must share it with his associates and, if having full indemnity he releases it, he forfeits the right of contribution. *Sherman v. Foster,* 158 N. Y. 587, 594, 53 N. E. 504. If a cosurety takes a chattel mortgage to indemnify himself and voluntarily discharges it without consent of his associates, they may efficiently plead such discharge as a legal defense to a claim against them for contribution. *Ramsey v. Lewis,* 30 Barb. 403. If a surety procures, or negligently allows, forced sales of the principal debtor's property and buys it in at a manifestly inadequate price, he is chargeable with the full fair value as regards his right of contribution. *Sanders v. Weelburg,* 107 Ind. 266, 7 N. E. 573. If a cosurety obtains from the principal a mortgage upon chattels, in form to secure himself against loss by reason of becoming a party to the surety contract, he thereby becomes a trustee of such security for the benefit of all the sureties, and if he loses the advantage by negligence, he commits a wrong to his associates, remediable by forcing an accounting as to the security, charging such loss to him, or by way of defense to his claim for contribution. *Steele v. Mealing,* 24 Ala. 285; *Taylor v. Morrison,* 26 Ala. 728; *Caryton v. Johnson,* 27 Ala. 503; *Paulin v. Kaighn,* 29 N. J. Law, 480.

All such instances were ruled by settled results, in the law, for violations of recognized duties,—not by the court's mere

conception, in any case, as an original matter, of what was just.

We are compelled, seemingly, to go elsewhere for illustrations of the principles above stated. Though there is an abundance of instances where they have been applied, there is dearth of such in the history of our own jurisprudence. Such principles are so well entrenched, as of legal as well as equitable cognizance, that modern text-writers turn the matter off by the mere statement that "the right to contribution may be destroyed by a subsequent contract of the parties, or . by the fault of the party who causes the loss toward which he seeks contribution from his co-obligor." 9 Cyc. 804.

Of particular significance here is the fact that both in law and equity, a cosurety is a *quasi*-trustee for his associates of all special advantages he acquires from the principal debtor,— either in adversary proceedings or otherwise,—for the benefit of the bearers of the common burden, with all the duties incident to such relation. He cannot specially profit out of it. He is liable for loss proximately caused to his associates by failure to honestly and with reasonable care perform his legal duty to his associates,—to reasonably conserve his special advantages for the common benefit; this having regard to acts of omission as to facilities under his control, or commission respecting fraudulently or negligently dissipating the means of paying the principal debt, or indemnity for losses occasioned by failure to pay,—especially indemnity derived from the business regarding which the liability has its origin. The duty in this regard is as strictly legal, though based on equitable principles, as it is plainly moral.

The foregoing, somewhat lengthy discussion, is for the purpose of showing that, upon the facts appearing, vitalizing, in the absence of anything of a defensive character, the right of contribution, what is matter of defense is dependable upon definite legal principles though they may be founded in equitable considerations. The inquiry is, Was the right parted

with by contract, or was it, in whole or in part, forfeited by breach of duty of some sort? What breaches, in general, constitute a defense to the claim for contribution, are well defined in the law,—so well that the facts being found, whether they constitute a defense or not, is matter of law, not matter of discretion. The issues may be presented in a legal or equitable action. If the latter, the court finds the facts and applies thereto the established rules of law. In the former, the jury find the facts from the evidence, as in any other case, and the court applies thereto, subsequently, the appropriate rules of law, or directs the jury how to find as a result of their determination of the controverted facts, according to whether the verdict is special or general.

Turning to the answer of respondent to appellant's claim for contribution, we find that the pleader grounded the defense on, *first,* a claim that when John C. Koch took over respondent's stock it was expressly mutually agreed, as part of the transaction, that the former should hold and save harmless the latter from all liability on the guaranty, and see to it that the obligee became a party thereto; *second,* the claim that, in the composition proceedings in bankruptcy of the corporation, the appellant, as personal representative of John C. Koch, obtained a secret advantage, in that, after securing respondent's consent to a compromise of the claim made on account of payment of the guaranteed debt, he exacted and obtained $6,500 for the worthless corporate stock, as a condition of joining in the composition. Thus no fraud or wrong, in that John C. Koch failed to reasonably, as regards respondent, conserve the assets of the corporation to protect the cosureties, was pleaded or, seemingly, thought of.

The evidence disclosed many facts giving rise, as we shall see, to a further defense which might have been pleaded at the start or insisted upon at the end. The circumstance that it was not so pleaded or insisted upon, or, perhaps, thought of at all, or if thought of to some extent, was not appreciated,

makes no difference now. If the judgment be right, as indicated at the outset,—right on facts found, expressly or inferentially, or both, or not found but appearing clearly from the evidence,—it must be sustained. The real right of the matter is the end to be attained in our system of jurisprudence. That being clear and having been arrived at without substantial prejudice to the adverse party, justice is satisfied however irregularly or illogically the judicial footsteps may have moved in reaching that goal.

The court found, specifically, in appellant's favor as to whether there was an express contract relieving respondent, as between the two parties to the transaction, from the burden of the guaranty,—found that no such contract was made. It is insisted, on the part of respondent, in support of the judgment that such finding is against the clear preponderance of the evidence. It is legitimate to make that claim. It is not so void of merit as to be unworthy of consideration.

The court seems to have reached the conclusion that the contract alleged to have been made never existed, from the evidence of what was said, expressly, between the two Kochs when the transaction in regard to the sale and purchase of the stock took place. There was but one witness to that who testified upon the trial,—the son of John C. Koch. He was an interested witness,—interested, as he came to definitely understand, in having it held that there was no contract. His evidence, from first to last, was somewhat contradictory. From one viewpoint, examined apart from corroborating circumstances, quite self-destructive. The trial court heard him give his testimony on one occasion and his effort, then, to square himself with what he had testified to on a former occasion, and came to the conclusion that his evidence in the whole was not sufficient to raise the burden of proof, which was on respondent, to establish the defense of contract surrender of the inchoate right of contribution.

We are somewhat constrained to the view that too little

weight in favor of respondent was given to the evidence re-
ferred to, and too little weight to the significant circumstances
corroborating the oral evidence directly tending to establish
the defense of contract.    However, in deference to the rule
requiring findings of fact by a trial court to be sustained un-
less clearly wrong, giving due weight in their favor to the su-
perior advantages of the trial jurisdiction for reaching a right
conclusion, we pause before passing the point of condemna-
tion.    With what has been said we may well leave this branch .
of the case, especially, since the result reached on another
branch renders going further unnecessary.    Really, whether
the finding has efficient support in the evidence might have
been passed altogether, but it seemed due to counsel who very
carefully briefed the matter as one of primary,—of vital sig-
nificance,—to discuss it at some length, omitting, however,
reference to the evidence in detail; speaking thereof only in
general character and effect, which omission would be sup-
plied before going to the length of overruling the decision.

It seems that the findings were intended to strictly follow
the claims of respondent as to a contract defense.    Only an
express contract was claimed.    The learned trial court
thought only of an express contract, expressly made, in the
technical sense.    Only that seems to have been specially and
plainly passed upon, as appears more clearly from the opin-
ion filed by the trial judge than by the findings.    It was not
essential to the defense of express contract that it should be
established to have been made by use of express language.

The findings are not altogether satisfactory on this branch
of the case.    If the judicial thought was either that respond-
ent was confined to proving an express contract, in the tech-
nical sense, because only such would be efficient in any event,
or because respondent elected by his pleading to stand on that,
or through inadvertence or other reason he omitted to prove
that a contract was otherwise made, as by an inference of fact
from all the circumstances of the transaction,—that is wrong.

All the evidence there was bearing on the question being before the court without objection, if by reasonable inference, or circumstantially, a contract was established to the effect that John C. Koch would protect respondent from the guaranty, the latter should have been awarded the benefit of it. We are inclined to think that a contract was so, pretty plainly, established.    If we were compelled, in reaching a final conclusion, to pass upon whether such matter was really intended to be affirmatively covered by the findings, and the result were in the negative, without much hesitancy, if any, it is thought, we should find that the reasonable implication from all that occurred in the purchase and sale of the stock, is that the minds of the parties contractually met to the effect that, as between respondent and John C., the latter should alone bear the burden of the guaranty.    If the result were that it was intended to be covered negatively, the finding could not be sustained without difficulty,—not, at least, without going to the limit of according dignity to the decision of the trial court as to matters of fact.    For the reason before given in regard to the finding as to the express contract feature, in the restrictive sense, we need not pursue this further or go into details as to the evidence and circumstances uncontrovertibly established thereby, which point, quite as persuasively, to the existence of a contractual meeting of minds as would plain contractual words.

What particular significance, in the legal conclusion, was given to the circumstance that appellant, as a condition of participation with the estate in the composition proceedings in bankruptcy, exacted and obtained for the estate $6,500 for the worthless corporate stock, does not appear.    The court freed appellant from any imputation of fraudulent purpose in failing to disclose to respondent the secret advantage obtained, and exonerated him from having made any false or fraudulent representations to induce the former to consent to compromise regardless of the secret advantage.    The learned

court seems to have thought that, if all the representations made by appellant to respondent were true, and the facts not disclosed were withheld without any real purpose of cheating respondent, and under such circumstances the latter gave his consent, he did it at his peril. In this, it does not clearly appear whether the court treated the two as persons who met and dealt in the attitude of, "at arm's length," in the business transaction, as in ordinary matters of contract, or not. The indications are in the affirmative. If that were the judicial thought, and it entered efficiently into the final result, to that extent such result is wrong.

As indicated, the relations between respondent and appellant in reference to the guaranty were those of trust and confidence. In the very nature of the case they could not meet or deal "at arm's length" unless by mutual consent. They met as bearers of a common burden, conceding for the time that respondent was held under the guaranty, and entitled to share fully in each other's confidence and advantage. It was not enough that appellant stated to respondent, truthfully, what he attempted to state and therefrom the latter formed his judgment to consent to the compromise. It was not enough, that in failing to disclose the secret advantage appellant had no thought of wronging respondent. He owed to him the duty of full disclosure. Failure to perform was a manifest breach of that duty,—a fraud in law, a remediable wrong, and, as such, a defense to the claim for contribution to the extent that respondent was damaged, and, in any event, to the extent of liability to account for the full amount of the secret exaction by applying it for joint benefit upon the loss suffered under the guaranty,—this upon settled principles heretofore discussed and declared.

We have reached the end as regards matters of fact, seemingly passed upon by the trial court. The general conclusion was that "under all the circumstances in this case it would be inequitable to require the said *Henry A. Koch* to contrib-

ute," etc.   It does not appear to be grounded on any definite
breach of duty specifically covered by the findings of fact.
It does not seem to have been appreciated that a legitimate
basis in contract, or some breach of duty, was necessary,—in
other words, that the judgment denying the right of contribu-
tion needed something to rest upon beside the mere discretion
of the court, unless it were thought that the mere circum-
stance by itself that John C. Koch purchased respondent's
stock at full value rendered him as matter of law equitably
liable to bear the whole burden of the guaranty, regardless of
any contract or breach of duty.   There is neither precedent
nor principle for that.

John C. may have taken the stock believing it was worth all
he gave and been mistaken, or in so believing counted, as an
element of value, on the advantage to the corporation of the
continued existence of the joint guaranty, or the property
have been in fact worth all he supposed and, through misfor-
tune or causes not attributable to any want of reasonable dili-
gence on his part, the business have become worthless, or all
the results happened leading to enforcement of the guaranty
without breach of duty on his part to respondent.   With no
contract surrender of the right of contribution, nor any breach
of duty which John C. owed to his cosurety, found, there
was no legitimate basis for the conclusion, in the letter of
the decision as to facts.   The case was not one for judi-
cial arbitration, but for judicial disposition upon settled
principles.   Wherein did John C. Koch wrong respondent?
Wherein is there breach of duty of the former to the lat-
ter which, under the law, constitutes a defense to the claim
for contribution?   The findings of fact, as indicated, are
silent as to that, so far as they speak specifically.   Are they
thus silent, speaking inferentially and circumstantially?   If
not, and an inference of fact plainly arises, *prima facie,*
from the specific facts found, that John C. Koch breached
his duty to respondent as cosurety, and thus the default

happened which caused resort to the guaranty and loss to the sureties,—if he might and would, but for negligence or other inexcusable fault in performance of his duty to reasonably conserve the advantages he enjoyed as controller of the corporation's business, to protect the guaranty and which but for such fault would have been protected, have prevented loss to the sureties,—that is a legal, moral, and equitable defense to the claim for contribution.

We repeat, the circumstance, if such be the fact, that the trial court, did not appreciate the foregoing and so made no finding with reference to it, does not militate against the efficiency thereof as a defense, if such fact plainly appear. It was the most significant matter in the case after passing the contract feature, and should have been dealt with as matter of fact, following the numerous circumstances found in much detail, and others shown conclusively by the evidence which might have been found, if mere matters of detail upon which the main fact was dependable, were to be covered.

On this vital branch of the case we do not overlook the distinction between the relations of partners and stockholders to each other, and associates in each capacity and the common property. We need not do more than make this passing reference to matters discussed in that respect in the briefs of counsel. They are not considered material because of the conclusion which seems inevitable.

At the time respondent and John C. had their stock deal, the two were, as clearly shown by the statement, virtually, though not directly, the owners of substantially all the corporate property. They controlled it as absolutely as if they had owned every dollar of outstanding stock, which they did in practical effect,—that is either as sole or trustee owners, the latter status only covering ten shares. They could have suspended operations, paid off the indebtedness, and surrendered their corporate charter at any time. *Prima facie*, they could have done so, paid all ordinary and stock liabilities,

and had somewhere around $37,500 left over; indicating pos-
session of assets of the value of $150,000 or more.    That
such value was real is evident from the fact that respondent
sold his stock on that as a cash basis.    The exact amount of
gross assets does not appear even by aid of a full statement of
indebtedness.    That all ordinary indebtedness was taken into
consideration and with that provided for $87,500 was found
left over, and so formed the basis of the stock trade, is evident
from the findings and undisputed evidence.    After the trade
the whole corporate property, to all intents and purposes, be-
came the individual property of John C.    It was primarily
liable for payment of the corporate indebtedness, including
that covered by the guaranty.    So his interest was subject to
the paramount right of creditors.    He was liable to the cor-
poration and through it for the benefit of its creditors, for
common care and honesty in administering the property.
Thus such property so controlled was the primary source for
protecting the guaranty.    It was as virtually under his power
as if he had possessed a chattel mortgage on it, as was the
circumstance in several of the cases heretofore cited.    In
that situation he owed the duty, as we have seen, to his co-
surety of a *quasi*-trustee of his advantageous position.    If
he dishonestly or negligently rendered the primary source for
discharging the guaranteed debts insufficient therefor, he
breached his duty to his cotrustee and incurred the legal,
equitable, and moral liability to lose his inchoate right of con-
tribution.    There is no rule better established in the law of
suretyship than that, the cosurety whose wrongful conduct
causes default, rendering resort to the guaranty necessary,
and producing loss to the sureties, cannot have contribution,
so far as loss was thus produced.

How did John C. Koch perform his duty, mentioned, to
respondent?    The fact, if it be a fact as the court found, that
the latter did not protect himself at the time of the stock
trade by an express definite contract as regards the guaranty,
only emphasizes the trustee status of John C. to conserve his

advantageous position for the bearers of the common burden, and shows that respondent relied wholly upon performance of that duty.

For nearly a year after the stock transaction aforesaid, John C. was sole master of the corporate situation. Then he transferred about two fifths of the stock to his sons, thus continuing in virtual control and the corporation exclusively his family affair,—evidently a convenient instrumentality for holding and investing the family property, and probably acquired for that purpose. That is the natural inference from the persistency with which John C. urged respondent to leave the corporate business solely to him. He continued to control the policy of the corporation till he died. On the face of things,—no explanation whatever having been offered by evidence,—with more than twice property enough at the start to pay all liabilities, ordinary and stock as well,—he so handled the situation as to cause the default and loss. He did that in the brief period of less than three years. At the end of that time there was nothing left of the prosperous corporation with stock worth seventy-five per cent. above par, of less than two years before, but a mere wreck to be wound up a short time later in bankruptcy, where a loss of property equal to some three times the face value of the capital stock, developed. Where did all that property go to in the brief space of time? How could it have been so dissipated without a most flagrant breach by John C. of duty to his cosurety and to the corporation as its managing officer? With no explanation of such strange shrinkage of assets,—and there is none in the record,—John C. Koch, deceased, stands, by necessary inference, convicted of such breach. With such a showing the burden was upon appellant to make a full explanation, exonerating deceased from the apparent dereliction. The status was very much like that of a trustee, when called upon to account, charged with trust property, unquestionably traced into his hands.

It is futile to argue that John C. did not own the property

or possess it as security.    Though he did not, in the technical sense, he did in all substantial sense, and his duty to his co-surety is plain.    The breach of it is plain.    The legal liability of forfeiture of the right of contribution is quite as plain.    Facts in that regard should have been expressly, as they are inferentially, embodied in the findings, followed by a declaration as a legal result, and equitable as well, that the claimed right of contribution was illegitimate.    If appellant here had brought suit at law against respondent for contribution, the facts indicated could have been pleaded as a perfect defense.    If upon the trial they had appeared as plainly as now, it would have been the duty of the court to have granted a nonsuit or direction of a verdict of no cause of action, especially if requested.    Had some, but not a full satisfactory explanation been made of the apparent breach, it would have been the duty of the court to have sent the case to the jury for a verdict in accordance with their finding as to the facts, regarding whether John C. Koch negligently or otherwise dissipated the property of the corporation, or permitted it, while it was under his control, and so brought about the loss upon the guaranty.

The foregoing seems so plain, the wonder is that appellant could have expected to recover on the obligation of contribution once existing, without making the suggested explanation. We must presume that this phase of the case, very plain as it seems to be and likewise its fatal character as indicated, did not occur to appellant or his counsel.    They went down to the trial on the first, and second occasions and persisted here, upon the theory that the only matter of clear efficient defense pleaded was the express contract, and that the case would stand or fall on that.    They were warranted in so thinking; as regards any disclosure of attitude by their adversary, or that of the court, so far as the result is grounded on any specific finding of fact clearly warranting it.

A question is raised by an appeal from the judgment taken

by a guardian *ad litem* who appeared for two minors having some interest in the litigation. Such guardian participated in the trial in county court. In taking the appeal to the circuit court he was not treated as an adverse party by service on him of the notice thereof. Upon the matter being brought to the attention of the appellate court, and after expiration of the ordinary time for serving notice where that is necessary, that court, in effect, permitted the guardian to waive all irregularities in that regard, and the guardian consented to do so to the extent his duty would permit. The record by petition and order was made accordingly, and pursuant thereto the guardian participated in the second trial.

The whole case was removed to the circuit court on the seasonable service of notice of appeal upon the personal representative of deceased. He stood for all interests. The guardian did not appear in the county court contest as matter of right. There is no rule of court or statute or unwritten law affording such right. It was proper for such court to recognize the interests of the minors in the special way it was done, but that did not give their special representative any control of the litigation. He was not a party in interest as in *Tyson v. Tyson,* 94 Wis. 225, 68 N. W. 1015. However, being recognized to specially conserve the somewhat remote interests of minors, the ordinary duties of the position, as suggested in *Tyson v. Tyson, supra,* applied.

This was not a case where a guardian was essential to jurisdiction. The only necessary party adverse to the claimant was the personal representative. All interested in the estate, in the collective sense, really the estate itself, vitalized by such representative, was the only adverse party to the claimant in the matter of the hearing on claims, and upon him notice of the appeal from county court, as required by sec. 4033, Stats. (1898), was duly served.

The guardian *ad litem* was permitted to appear after the nature of *amicus curiæ,*—recognized as such by reason of

the remote interest of the minors. A person having such a status is not an adverse party within the meaning of the statute, who is entitled to recognition as such in appeal proceedings. 2 Ency. Pl. & Pr. 159.

However, we quite agree with counsel for respondent, that it was competent for the guardian, by permission of the court, to waive any irregularity there might have been in failing to recognize him as a party in the appeal proceedings. Such irregularities are waivable either expressly or by conduct. *Kasson v. Estate of Brocker,* 47 Wis. 79, 1 N. W. 418. The jurisdictional feature of the appeal statute, as regards county court matters, is in sec. 4031, Stats. (1898), which provides that any person aggrieved by a decision of the county court "may appeal therefrom to the circuit court . . . by filing a notice thereof with said county court within sixty days from the date of the act appealed from, . . . together with such undertaking as is required" by sec. 4032. Thus the prime essential, as said in *Charmley v. Charmley,* 125 Wis. 297, 301, 103 N. W. 1106, is the filing of the notice of appeal within the time required. Compliance even with the requirement as to filing the bond has reference to perfecting the appeal which may be done somewhat irregularly and yet be sufficient. *Perkins v. Shadbolt,* 44 Wis. 574.

So from any viewpoint, the judgment rendered below and affirmed here, is binding on all parties interested in the estate, including the minors represented by the guardian *ad litem.*

*By the Court.*—The judgment is affirmed on both appeals.

A motion for a rehearing was denied March 12, 1912.