SIXTH DIVISION
June 8 , 2007

No. 1-04-0588

| | | |
|---|---|---|
| DON C. TROSSMAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff and Counterdefendant-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 95 CH 3430 |
| | ) | |
| THOMAS D. PHILIPSBORN, ANDREW I. | ) | |
| PHILIPSBORN, DANIEL C. BARTOK and | ) | Honorable |
| JOHN J. LYNCH, | ) | Ronald F. Bartkowicz, |
| | ) | Judge Presiding. |
| Defendants and Counterplaintiffs-Appellants) | | |
| | ) | |
| (Oak Park Partners, Ltd., and Burnham Investors, Ltd., | ) | |
| The Philipsborn Company, Philipsborn Development Corp.,) | | |
| and Clarion Development Limited Partnership, | ) | |
| | ) | |
| Defendants). | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff Don C. Trossman originally commenced this action in the chancery division

seeking to compel profit distributions due to him from defendants Oak Park Partners, Ltd. (Oak

Park Partners), and Burnham Investors, Ltd. (Burnham Investors), in both of which he was a

limited partner.  Defendants Thomas D. Philipsborn and John J. Lynch filed a counterclaim for

*pro rata* contribution or, in the alternative, a declaration of continuing obligation, to contribute to

payments they, through their company, The Philipsborn Company (TPC), made on a guaranty to

LaSalle National Bank (LaSalle), pursuant to which Trossman was a co-guarantor.[1]

---

[1]On August 25, 1997, the circuit court granted summary judgment in favor of Trossman

on his claim to compel distributions from Oak Park Partners and Burnham Investors.  This

Subsequently, Andrew I. Philipsborn and Daniel C. Bartok were joined as defendants-counterplaintiffs.[2] The circuit court granted the Philipsborns and Lynch's (hereinafter, collectively, counterplaintiffs') motion for partial summary judgment on the issue of Trossman's liability for contribution to the payments to LaSalle. Subsequently, pursuant to a fee-shifting provision of the indemnity and contribution agreement between the parties, the circuit court awarded Trossman $447,805,72 in attorney fees and costs he incurred in defending the counterclaim. Only counterplaintiffs' counterclaim for contribution and the award of attorney summary judgment order is not at issue on appeal. Upon the entry of this order, the matter was transferred to the law division for the resolution of defendants' counterclaim.

Trossman thereafter amended his complaint to add: a claim for distribution from Oak Park due to him for the year 1997, captioned count III; a claim for breach of an employment contract in connection with his employment at TPC, captioned count IV; a claim for rescission of his stock buy-back by TPC, captioned count V; a claim for breach of an alleged oral contract requiring TPC's wholly owned subsidiary, Philipsborn Development Corporation, to continue to make payments to LaSalle in a timely fashion, captioned count VI; a claim for rescission of an indemnity and contribution agreement among co-guarantors of the LaSalle loan, captioned count VII; and a claim for attorney fees should he prevail on any claims or defenses in connection with the indemnity and contribution agreement, captioned count VIII. None of these counts are at issue on appeal.

[2]Subsequently, the circuit court granted partial summary judgment in Trossman's favor as to Bartok's counterclaim. It was undisputed that Bartok made no payments in excess of his *pro rata* share on the guaranty. Defendants do not purport to appeal that ruling.

2

fees and costs in connection therewith are at issue on appeal. For the reasons that follow, we affirm in part and remand in part.

BACKGROUND

In their counterclaim, counterplaintiffs alleged the following. Counterplaintiffs and Trossman entered into an agreement with LaSalle to jointly and severally guarantee the obligations of the Wysteria Limited Partnership (Wysteria), in which Trossman was a limited partner. Contemporaneously with entering into the guaranty agreement, Trossman and counterplaintiffs entered into an indemnity and contribution agreement which obligated Trossman to contribute a *pro rata* share to payments on the LaSalle guaranty. It was further alleged that LaSalle demanded payment from the guarantors, and counterplaintiffs made payments to LaSalle in satisfaction of the guaranty. Trossman had not made any payments to LaSalle. Counterplaintiffs sought damages and attorney fees in connection with Trossman's alleged breach of the indemnity and contribution agreement. In the alternative, counterplaintiffs sought a declaration that, under the indemnity and contribution agreement, Trossman was under a continuing obligation to contribute his *pro rata* share to payments under the guaranty and, further, that counterplaintiffs were entitled to attorney fees incurred in enforcing the indemnity and contribution agreement. As noted in greater detail below, in their subsequent motion for summary judgment counterplaintiffs would assert that Trossman owed contribution with respect to the payments TPC made to LaSalle beginning in February of 1995.

In his affidavit,[3] Trossman gave the following background of Wysteria. Wysteria was

_____

[3]Attached to his response to Thomas Philipsborn and Lynch's motion for summary

organized in 1990 for the purpose of acquisition and development of a residential townhome complex in Olympia Fields, Illinois. Wysteria was to construct and sell 88 completed townhomes. The limited partnership agreement executed on November 20, 1990, a copy of which is included in the record on appeal, provided, in pertinent part:

> "No limited partner shall be liable for any debts of the Partnership or any of its obligations except to the extent of his commitments to the Partnership capital and his share of undistributed profits."

In 1991, Trossman became a limited (0.99%) partner in Wysteria by investing $14,250. In 1994, Trossman made another contribution of $2,500. In addition to Trossman, Wysteria's limited partners included the Philipsborns, Lynch, Bartok and approximately 15 other investors. Wysteria's general partners were TPC's wholly owned subsidiary, Philipsborn Development Corporation (PDC), and Bartok's company, Clarion Development.

Trossman further stated in his affidavit that Wysteria entered into two loan agreements with LaSalle—an acquisition loan and a construction loan (hereinafter, collectively, the Wysteria loan or the LaSalle loan). LaSalle required that Bartok, the Philipsborns, Lynch and Trossman execute personal guarantees of the Wysteria loan. On January 28, 1991, Trossman and counterplaintiffs entered into a guaranty agreement with LaSalle, agreeing to, jointly and severally,

> "absolutely, unconditionally, continually and irrevocably guaranty the prompt payment, timely performance and satisfaction in full of all covenants, agreements

judgment.

and obligations of Borrower under the Loan Instruments and all Borrower's Liabilities in accordance with the terms of the Loan Instruments. Guarantors absolutely and unconditionally covenant and agree that, in the event that Borrower is unable to, or does not, pay, perform or satisfy Borrower's Liabilities, in a full and timely manner, for any reason, *** no such occurrence shall in any way reduce or affect Guarantors' obligations hereunder and Guarantors shall pay, perform or satisfy Borrower's Liabilities. Upon the occurrence of a default in the prompt payment, timely performance and satisfaction in full of Borrower's Liabilities, all of the obligations of Guarantors shall, at the election of the Lender, become immediately due and payable. The term[] 'Borrower's Liabilities' *** shall have the meaning[] ascribed to [it] in the Mortgage."

The guaranty agreement further provided:

"Guarantors hereby expressly waive:

*** notice of any default under any of the *** Loan Instruments *** or notice of the taking of any action or the exercise of any remedy by Lender under the Loan Instruments;

*** Presentment, demand, notice of dishonor, protest and notice of protest, notice of any and all defaults and all other notices whatsoever ***."

Lastly, the guaranty agreement provided:

"[M]odification of the economic terms of either or both of the Notes, or the replacement or substitution of either of them, shall not be permitted by Lender

5

without prior written notice thereof to Guarantors."

"Event of Default" was defined, in pertinent part, in the Wysteria loan agreement, which was entered into on January 25, 1991, and is part of the record on appeal, as follows:

"(a) If Borrower shall (i) fail to pay within five (5) days following the date when due any payment of principal or interest ***; (ii) fail to make any other payment required by the terms of this Agreement or any of the other Loan Instruments within five (5) days after delivery of notice of such failure to Borrower ***.

(b) If a default shall occur under any of the other Loan Instruments and the same is not cured within such cure, grace or other period, if any, provided in such Loan Instrument ***."

Neither the agreement nor the loan notes provided how a default might be cured. The agreement did, however, provide, in pertinent part, that, upon the occurrence of a default, "Lender's obligation to make any further disbursements of the Loans shall terminate," and Lender may, among other things, "[d]eclare all of Borrower's Liabilities to be immediately due and payable." Similar definitions and provisions were used in other instruments governing the Wysteria loan.

Trossman further admitted in his affidavit that, contemporaneously with entering into the guaranty agreement, he and counterplaintiffs entered into an indemnity and contribution agreement, which provided, in pertinent part, that in the event the guaranty is triggered, "Trossman shall be liable for 10.9% of the cost of the [Wysteria] Obligations." The indemnity and contribution agreement further provided:

6

"To the extent Clarion and Bartok, Lynch, A. Philipsborn, T. Philipsborn or Trossman contributes in excess of its respective Share of Obligations ('Excess Contributor') such Excess Contributor may recover the excess which it has paid from each other party on a pro rata basis to the extent such other party has not contributed its entire Share of Obligations."

Additionally, the indemnity and contribution agreement provided:

"To the extent PDC makes any payment toward the Obligations, PDC's payment shall be attributed and credited as if the following individually had made such payment as a contribution to his Share of Obligations:

| | |
|---|---|
| Lynch | 21.8% x PDC payment |
| A. Philipsborn | 21.8% x PDC payment |
| T. Philipsborn | 34.6% x PDC payment |
| Trossman | 21.8% x PDC payment." |

The agreement further provided examples of how such *pro rata* contributions should be computed in the event LaSalle collected payment from some of the guarantors pursuant to the guaranty. Additionally, the agreement provided:

"If the wilful or wanton act or failure to act *** of Clarion or Bartok, Lynch, A. Philipsborn, T. Philipsborn or Trossman occur[s]

(i) outside the scope of any agreement entered into (with the knowledge and consent of all other parties, Wysteria and Borrower) by one or more of the parties, Wysteria or Borrower, pursuant to the Loan, and

7

(ii) without the knowledge and consent of the other party or parties to this

Agreement ('Unknowing Parties');

and result in

(iii) Lender collecting pursuant to the Guaranty ***

***

then the party or parties responsible for such Acts or knowing of and consenting

to such Acts *** shall have its or their Share of the Obligations for all costs

attributable for such Acts (collectively referred to as 'Attributable Costs')

increased to 100.0% and those Unknowing Parties not responsible for such acts

shall have their Share of Obligations for such Attributable Costs decreased to

0.0%."

Lastly, the indemnity and contribution agreement provided:

"If any legal action is instituted hereunder, the prevailing party or parties

shall be entitled to recover from the other party or parties reasonable attorneys'

fees and disbursements."

Trossman further stated in his affidavit that it was understood between the parties that it

would take considerable time to develop and market the Wysteria project and, therefore,

Wysteria would not initially generate sufficient cash flow to make payments on the loan. With

that understanding, an oral agreement was reached in late 1990 between TPC, PDC, the

Philipsborns, Lynch and Trossman that TPC would channel funds to PDC to make all required

payments in connection with the Wysteria project and keep the LaSalle loan in good standing.[4]

Trossman further stated that it was the intention of the parties to the oral agreement that all payments would be made through PDC, so that, pursuant to the indemnity and contribution agreement, the parties would individually be credited with having made a percentage of the payment (in Trossman's case 21.8%). Trossman stated that PDC had no assets other than those it received from TPC. Lastly, Trossman asserted:

> "The LaSalle loans have never been declared by LaSalle to be in default;
> have never been accelerated; have never been the subject of late charges, default
> interest rate and have never been the subject of any enforcement proceedings
> against the borrower, such as exercise of the assignment of rents or foreclosure."

In the course of discovery, depositions were taken of Trossman, Lynch, who was vice-president and treasurer of TPC, and Ronellva Ziebart, who was senior vice-president and head of residential division at LaSalle.

In his deposition, Trossman testified as follows. He was employed as an officer of TPC, a closely held corporation, from 1981 until 1991. During that period, Trossman owned approximately 21.8% of TPC's outstanding stock, and the Philipsborns and Lynch owned the rest. In 1991, Wysteria (one of whose general partners, as noted, was TPC's wholly owned subsidiary, PDC, which had no assets of its own) ran into financial difficulties, which had a negative effect on TPC's financial situation. In 1991 or 1992, Trossman resigned his

---

[4]Trossman also referred to this oral agreement in numerous amendments to his complaint and throughout discovery.

employment with TPC because all of the shareholders/officers had agreed to take no compensation until TPC's financial situation improved. Trossman explained that without a salary from TPC, he was unable to meet his living expenses. TPC did not buy out Trossman's shares at the time of his departure, but extended him a buy-out offer in late 1993.

Trossman further testified that, in addition to TPC and Wysteria, he was also a limited partner in Oak Park Partners and Burnham Investors, which owned and operated apartment buildings. The general partner in Oak Park Partners and Burnham Investors was TPC. TPC's shareholders/officers also held shares and served as officers of PDC, Oak Park Partners, Burnham Investors and Wysteria. According to Trossman, Thomas Philipsborn and Lynch "controlled" TPC, PDC, Oak Park Partners, Burnham Investors and Wysteria. Although Trossman left employment with TPC in 1991 or 1992 and sold his shares in TPC in 1993, he remained a limited partner in Oak Park Partners, Burnham Investors, and Wysteria.

Trossman further testified in his deposition that, in late 1994, TPC requested that he contribute funds toward Wysteria's obligations to LaSalle. A letter dated September 26, 1994, sent to Trossman by TPC and signed by Thomas Philipsborn, who was identified as president of TPC, stated, in pertinent part:[5]

> "To date, The Philipsborn Company [(TPC)] has advanced $622,000 for
> cash flow shortfalls at Wysteria. In addition, Dan Bartok has advanced substantial
> additional amounts, although not in a total amount equal to his obligation under

---

[5]This letter, as well as other letters between the parties, was attached as an exhibit in support of counterplaintiffs' motion for summary judgment.

10

the guarantee. In effect, The Philipsborn Company has been subsidizing the guarantee obligation of Don Trossman and Dan Bartok.

We are unwilling to do this any longer without some formal agreement as to how amounts paid by Philipsborn are to be repaid. Since LaSalle is pressing for an interest payment and the payment of real estate taxes before the end of this week, it is imperative that we meet this week."

In a letter dated November 21, 1994, Trossman alluded to a recent meeting he had with Lynch and stated, in essence, that rather than owing money in connection with Wysteria, he was entitled to a "credit" in the amount of $155,042.69, which represented 21.8% of the total amount PDC had made in contributions to Wysteria. Trossman further stated that because, pursuant to the indemnity and contribution agreement, he was "responsible for only half of that amount, it is apparent to [him] that [he has] the right to seek reimbursement from 'somebody' in the amount of $77,521.34." Trossman additionally stated that he wished to be released from the guaranty and, to that effect, was "willing to assign [his] $77,521.34 claim to whomever you designate and to transfer to the designee(s) [his] partnership interest in Wysteria" and in another partnership. Lastly, Trossman stated, "Under no circumstances will I pay anything close to what has been requested of me in Tom's initial response to my request that I withdraw from Wysteria."

A letter dated November 30, 1994, next sent to Trossman, by TPC and signed by Lynch and the Philipsborns stated, in pertinent part:

"Due to the unavailability of funds at Wysteria Limited Partnership, we have today advanced the sum of $17,500 to Wysteria Limited Partnership ***.

11

Said advance was made pursuant to the Guaranty of Payment and Completion dated January 28, 1991. *** In accordance with the Indemnity and Contribution Agreement dated January 28, 1991, we are entitled to collect 21.8% of this advance from you. Please forward your check in the amount of $3,815.00 made payable jointly to the undersigned."

On the same date, November 30, 1994, Trossman sent Lynch a letter, wherein he stated, in pertinent part:

"I have again reviewed the Indemnity and Contribution Agreement dated January 28, 1991. I have also had my counsel review this document and the Wysteria Partnership Agreement. Neither of us can find any liability to me per your request for reimbursement for certain sums advanced by either Philipsborn Development Corp. or The Philipsborn Company. If The Philipsborn Company advanced the funds, as you say, then you have created a 'third party' loan for which I have no liability. *** Further, capital calls can not be made by a non-partner. On the other hand, if the funds were advanced by Philipsborn Development Corp., then I have a credit as I stated in my letter of November 21, 1994. Either way I am not personally liable for any funds advanced to date."

Trossman further testified in his deposition that, in late 1994, he learned that Oak Park Partners and Burnham Investors failed to distribute to him his share of the profits from their operations. Trossman wrote to Thomas Philipsborn, demanding his distribution check. Subsequently, Trossman met with Lynch, who told him that he would receive no distributions

until he satisfied his guarantor obligations in connection with Wysteria.

On February 23, 1995, LaSalle wrote to all the guarantors a letter stating:

"This letter constitutes a notice given pursuant to that certain Guaranty of

Payment and Completion dated as of January 28, 1991 *** with respect to *** the

Wysteria Loan.

You are hereby notified that interest on the Wysteria Loan, in the amount

of $27,480.65 was due and payable on February 1, 1995 and is now past due.

***

We hereby demand that the Guarantors pay such interest in accordance

with the provisions of the Guaranty."

A letter dated February 23, 1995, sent to Trossman, by TPC and signed by Lynch, who was

identified as vice-president and treasurer of TPC, alluded to the LaSalle letter and further stated:

"Your share of the amount due is $2,995.39, in accordance with the

Indemnity and Contribution Agreement dated January 28, 1991.  Strictly as an

accommodation, The Philipsborn Company will act as a collection agent for the

contributions of the Guarantors and then make a single payment to LaSalle Bank

on their behalf.  If you wish to take advantage of this, please deliver your check to

The Philipsborn Company ***."

Trossman responded by a letter dated February 28, 1995, wherein he stated, in pertinent

part:

"You claim that I now owe $2999.39 [*sic*] under the terms of the

13

Indemnity and Contribution Agreement dated January 28, 1991. In calculating that amount, you evidently have failed to provide me with the credit for which I have been entitled pursuant to Section 3 of that Indemnity and Contribution Agreement. I will commence making payments of the amounts due and owing from me under the terms of the Indemnity and Contribution Agreement once the aggregate of my credit under paragraph 3 of that Agreement has been exhausted."

Subsequently, every month letters requesting payments of interest, real estate taxes and/or life insurance premiums for Thomas Philipsborn's policy were sent to Trossman by LaSalle and TPC. In his deposition, Trossman admitted to having received the letters and further admitted that he did not make any payments.

Lynch, in the course of his deposition, answered questions regarding one of the business records, captioned "Advances to Wysteria." Lynch testified that between 1991 and 1994 PDC "advanced" Wysteria a total of $577,050, of which $23,000 had been "repaid." Lynch also stated that in 1992 TPC advanced Wysteria "substantial amounts." Since the end of 1994, all advances to Wysteria were made by TPC. Lynch further testified that the funds for the advances PDC made to Wysteria were, in turn, loaned to PDC by TPC. To enable TPC to make those advances, the officers of TPC had foregone taking a salary. In that regard, Lynch testified that in May of 1992, Trossman approached him about resigning from TPC, explaining that he needed to find a job that paid him a salary. In late 1993, TPC repurchased Trossman's shares and repaid a loan note he held for a total of approximately $30,000.

Regarding the status of the Wysteria loan, Lynch testified that, to his knowledge, LaSalle

never declared the loan to be in default. Lynch further stated that had LaSalle ever declared the loan in default, the notice of default would have gone to all the guarantors, and he would likely have received it. However, Lynch subsequently stated that the Wysteria loan was in default "for brief periods of time" when the interest and real estate taxes were not timely paid. When further questioned, Lynch admitted that, as of the time his deposition was taken, in October of 1996, LaSalle was still "funding" the Wysteria loan.[6]

Lynch further testified that because Wysteria had trouble selling townhomes, as originally planned, the partners decided to modify the original plan and sell lots for stand-alone single-family homes instead of completed townhomes. LaSalle consented to that proposed change in the development plans.

Lastly, Lynch admitted that, in late 1994, he telephoned LaSalle and informed it that no further payments would be made on the Wysteria loan, absent a written demand from LaSalle. In response to that phone call, LaSalle began sending demand letters to the guarantors. Lynch categorized the payments TPC made to LaSalle pursuant to LaSalle's demands as "advances" from TPC to the guarantors. Lynch admitted that neither he nor the Philipsborns personally made payments to LaSalle.

Ziebart, who, as noted, was a senior vice-president at LaSalle, was also deposed and testified as follows. Ziebart was questioned about an internal LaSalle document that stated:

"LaSalle National Bank has been notified by the guarantors of the credit

---

[6]Evidently the word "funding" refers to LaSalle having renewed the note and extended the date of its maturity.

15

facility that requests for interest payments must be made in writing. We will comply with this request and are having legal counsel prepare the letter which will be used for this request. Upon receipt of that letter, the guarantors are prepared to bring interest current, thus allowing for the booking of the 60-day renewal."

Ziebart stated that she could not remember any specifics as to how LaSalle was notified of the guarantors' request. She further stated that she could not recall why LaSalle elected to continue to make requests for interest payments in writing. When questioned as to whether the loan was in good standing at the time the request was made, Ziebart replied: "No notice of default had been issued. However, the interest was not current on the loan." However, when questioned whether, aside from the request from the guarantors, there was any reason to issue requests for interest payments on a continuous basis, Ziebart responded, "Not that I'm aware of." Further, Ziebart testified that she was not aware of any other instances where LaSalle had issued similar letters based on a request from a guarantor. When again questioned whether the Wysteria loan had ever been declared in default, she responded, "Not that I recall." Similarly, when questioned whether default (higher) rate of interest had ever been demanded by LaSalle or whether the loan had ever been accelerated, Ziebart responded, "No, *** not that I recall." Further, Ziebart admitted that had any of those events happened, she would have known about it.

On June 24, 1997, Thomas Philipsborn and Lynch[7] moved for summary judgment on their counterclaim against Trossman, arguing that he owed them contribution toward past and

[7]As noted, originally, only Thomas Philipsborn and Lynch were counterplaintiffs in this action.

16

future payments on the Wysteria loan. In his supporting affidavit, Lynch, consistent with his deposition testimony, asserted that commencing in February of 1995, and continuing on a monthly basis, he received letters from LaSalle requesting that guarantors make payments on the Wysteria loan. Lynch further stated that his guarantor obligations, as well as the obligations of Thomas and Andrew Philipsborn, had been paid "on [their] behalf by [their] company, the Philipsborn Company." Lastly, Lynch stated that between 1995, when LaSalle first demanded payment, and May of 1997, TPC's payments to LaSalle totaled $509,236.70. Subsequently, on August 8, 1997, Thomas Philipsborn and Lynch filed another motion for summary judgment on their counterclaim, advancing substantially the same grounds. Counterplaintiffs had apparently abandoned their claim for contribution with respect to payments made prior to February of 1995, and only pursued contribution with respect to payments made in February of 1995 and beyond.

In a response, filed on September 4, 1997,[8] Trossman for the first time asserted that the Philipsborns and Lynch did not personally make payments on the guaranty. In support, Trossman attached copies of the checks to LaSalle, which were issued by TPC, and not the individual guarantors. In further opposition to counterplaintiffs' motion for summary judgment on the counterclaim, Trossman, in multiple supplemental briefs, argued, in essence, that the indemnity and contribution agreement was never triggered because Wysteria never defaulted on

---

[8]This response was styled as a motion to strike the motion for summary judgment. Subsequently, on October 6, 1997, Trossman filed a motion to dismiss the counterclaim on the ground that the payments were not made by counterplaintiffs individually in satisfaction of the guaranty.

17

its obligations. In support, Trossman attached, among other exhibits, copies of a series of modifications to the Wysteria loan to extend the date of its maturity, with the last modification having taken place on April 1, 1997. The modification agreement of April 1, 1997, contained the following clause:

"Borrower hereby ratifies and confirms the Amended Loan Instruments. After giving effect to this Agreement, the Amended Loan Instruments are in good standing and remain in full force and effect as so amended ***. Each party to this Agreement acknowledges that, after giving effect to this Agreement, to the best of his knowledge no Event of Default or event which, with the passage of time, the giving of notice, or both, would constitute an Event of Default, has occurred and is continuing."

On December 24, 1997, January 24, 1998, and June 24, 1998, the circuit court, Judge Neville presiding, heard oral arguments in connection with the motion for summary judgment on counterplaintiffs' counterclaim. On June 24, 1998, Judge Neville granted counterplaintiffs' motion for summary judgment on the counterclaim as to liability, and reserved the issue of damages to be decided at a later date. Judge Neville stated in open court his reasons for granting counterplaintiffs' motion for partial summary judgment:

"I find that there is an agreement between the parties that if there is a payment made to LaSalle, they are all in for their percentage, and that appears to me to be a slam dunk for the other guarantors. They have paid the money."

On October 8, 1998, Trossman filed a "Motion for Rehearing and Entry of Judgment on

18

the Pleadings And/Or Summary Judgment in Favor of Trossman Regarding Counterplaintiffs Lynch and the Two Philipsborns"—which, in substance, was a motion for reconsideration combined with a belated countermotion for summary judgment in Trossman's favor. In this combined motion, Trossman raised a new theory that counterplaintiffs did not suffer any damages, and, in support, attached an affidavit of Jerome Lipman, an expert in accounting. Upon examining various corporate documents and financial statements, Lipman opined that TPC's subsidiary, PDC, was a "shell corporation" created with "minimal equity"—which was a usual and customary set up in the real estate industry, designed to minimize liability exposure of the parent and the parent's shareholders. Lipman therefore further opined that it would have been impossible for PDC to service its debt without support from its parent, TPC. Lipman additionally stated that despite the fact that the checks to LaSalle were written by TPC, the corporate accounting records indicated that the payments to LaSalle were made by PDC with the funds provided by TPC, *i.e.*, on PDC's behalf. Lipman also stated that TPC's financial statements contradicted counterplaintiffs' assertion that TPC was acting as a collection agent for counterplaintiffs' individual payments pursuant to the guaranty. The accounting records indicated that the payments were not made on behalf of the individual TPC shareholders and further showed that the payments were treated as tax deductions, whereas payments on behalf of the individual shareholders would not have been deductible. Lastly, Lipman stated that the accounting records did not show that any of the counterplaintiffs made personal payments to LaSalle or repaid TPC a portion of the money it paid to LaSalle; nor did the accounting records disclose any amounts due to TPC from counterplaintiffs in connection with the payments to

No. 1-04-0588

LaSalle.

On December 14, 1998, in addition to Trossman's combined motion for reconsideration and belated countermotion for summary judgment, the following motions then pending before the circuit court were ruled upon by Judge Neville: counterplaintiffs' motion for award of damages; TPC's motion to dismiss count IV of Trossman's amended complaint; counterplaintiffs' motion for summary judgment on counts V, VI, and VIII of Trossman's amended complaint; Trossman's motion to dismiss the declaratory judgment count of counterplaintiffs' counterclaim; and Trossman's motion to strike counterplaintiffs' affirmative defenses. Judge Neville took under advisement counterplaintiffs' motion for award of damages[9]; granted counterplaintiffs' motion to dismiss count IV of Trossman's amended complaint; granted counterplaintiffs' motion for summary judgment on count V; denied counterplaintiffs' motion for summary judgment on count VIII; continued counterplaintiffs' motion for summary judgment on counts VI; denied Trossman's combined motion for reconsideration and countermotion for summary judgment, except as to Bartok, which was granted; continued Trossman's motion to dismiss the declaratory judgment count of counterplaintiffs' counterclaim; and granted Trossman's motion to strike counterplaintiffs' affirmative defenses.

On December 15, 1998, Judge Neville entered judgment against Trossman on counterplaintiffs' counterclaim in the amount of $74,713.23, but reserved ruling on counterplaintiffs' request for prejudgment interest. On January 12, 1999, Trossman filed two

[9]With the exception as to Bartok, who, as previously noted, was not entitled to contribution because he made no payments in excess of his *pro rata* share on the guaranty.

20

"Motion[s] for Rehearing" which sought reconsideration of Judge Neville's rulings rendered on December 14, 1998, regarding counts IV and V of Trossman's complaint, which are not at issue on appeal. On January 13, 1999, Trossman filed a similar "Motion for Rehearing" with respect to the rulings entered on December 14, 1998, and December 15, 1998, as to liability and damages with respect to counterplaintiffs' counterclaim.

As of July 26, 1999, Trossman's complaint was still not resolved in its entirety. It appears that Trossman wanted to appeal the partial summary judgment entered against him on the counterclaim and, to that effect, on July 26, 1999, the circuit court entered an agreed order which amended the December 1998 orders by adding the language that those orders were final and appealable pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)). On August 19, 1999, Trossman filed a notice of appeal. However, on February 15, 2001, this court dismissed Trossman's appeal for lack of jurisdiction on the grounds that the December 1998 rulings Trossman sought to appeal lacked requisite finality due to the pendency of the motions for reconsideration filed in January of 1999, which were never ruled upon.

On April 26, 2001, after the matter was remanded to the circuit court, counterplaintiffs moved to strike Trossman's January 1999 motions for reconsideration. On May 1, 2001, Trossman filed another motion to reconsider the grant of summary judgment on counterplaintiffs' counterclaim with respect to the issue of liability, as well as the award of damages in the amount of $74,713.23. Trossman argued that "at the very least, *** numerous issues of fact prevented summary judgment in favor of counterplaintiffs." Trossman further argued that *he* was entitled to summary judgment on counterplaintiffs' counterclaim. Trossman asserted, among other

things, that because counterplaintiffs committed a willful and wanton act in causing LaSalle to collect on the guaranty, he should be absolved of his contribution obligation. Trossman further reiterated that counterplaintiffs did not personally make payments of the Wysteria obligations to LaSalle, and that he did not have obligations under the indemnity and contribution agreement, which was derivative of the guaranty, because he had no obligation under the guaranty itself. Rather than arguing, as he did earlier, that the guaranty was never triggered, Trossman argued that the material modification, without notice to him, of the Wysteria project rendered the guaranty unenforceable against him.

By this time, Judge Neville had retired and the matter was assigned to Judge Henry. The parties rebriefed the matter before Judge Henry. On June 12, 2001, Judge Henry granted Trossman's motion for reconsideration and vacated the grant of summary judgment in counterplaintiffs' favor on the issue of Trossman's liability on counterplaintiffs' counterclaim. Trossman's motion for summary judgment remained pending. Judge Henry's order also reflects that counterplaintiffs withdrew their motion to strike Trossman's January 1999 motions for reconsideration.

On January 21, 2002, the matter was reassigned to Judge Bartkowicz, who ruled on Trossman's motion for summary judgment on counterplaintiffs' counterclaim on November 22, 2002. Judge Bartkowicz granted summary judgment in Trossman's favor on the counterclaim and ordered briefing on the remaining issues. Judge Bartkowicz's reasons, as stated in open court, for granting summary judgment in favor of Trossman were as follows: (1) the indemnity and contribution agreement clearly and unambiguously provided that any payments PDC made

on the guaranty would be credited to the individual guarantors in their respective *pro rata* shares and did not purport to limit such credit in the event Trossman left TPC; and (2) under Sterling Radio Stations, Inc. v. Weinstine, 328 Ill. App. 3d 58, 765 N.E.2d 56 (2002), which held that a guarantor did not suffer any damages where a corporation in which he was a shareholder paid the judgment on the guaranty, counterplaintiffs individually did not suffer any damages because the payments were made by their corporation, TPC.

On December 17, 2002, Trossman filed a motion, pursuant to the fee-shifting provision of the indemnity and contribution agreement, for attorney fees and costs he expended in defending the counterclaim. On March 18, 2003, Judge Bartkowicz entered an agreed order stating, in pertinent part, that summary judgment be entered in Trossman's favor on the issue of counterplaintiffs' joint and several liability for Trossman's reasonable attorney fees and costs related to the claims and defenses raised pursuant to the indemnity and contribution agreement. On April 15, 2003, Trossman submitted his petition for attorney fees and costs in the amount of $445,725.05, plus attorney fees and costs he would incur in the future in connection with bringing this petition. Trossman admitted that, in the course of the litigation, he changed attorneys a number of times and, at times, employed multiple firms at the same time. Trossman attached the billing statements from all the lead and consulting attorneys he retained in connection with this litigation. Trossman also submitted detailed affidavits from all the attorneys. Trossman maintained that the attorney fees and costs he incurred were reasonable.

In their response, counterplaintiffs argued that the fees and costs sought by Trossman were "grossly inflated," pointing out that Trossman had used 4 different lead attorneys and 15

different attorneys overall, which substantially increased the cost of litigation, especially in that multiple, successive attorneys had to familiarize themselves with the case. Counterplaintiffs further asserted that Trossman's petition improperly sought reimbursement for attorney fees and costs he incurred with respect to the aspects of the litigation which had nothing to do with counterplaintiffs' counterclaim. Counterplaintiffs additionally pointed out that the amount in dispute on the counterclaim, at its largest, did not exceed $200,000 and further noted that, by comparison, their own fees and costs totaled approximately $106,000. In support, counterplaintiffs attached an affidavit of their lead attorney, Richard R. Winter, who estimated that, of the $106,825.08 charged by his firm for all the work done for counterplaintiffs since 1995, approximately one-third was incurred in connection with matters unrelated to the counterclaim. Counterplaintiffs asserted that, using their own attorney fees as a benchmark, a fee of no more than $70,000 could legitimately and reasonably be attributed to the counterclaim. Lastly, counterplaintiffs argued that the fee-shifting provision did not contemplate reimbursement for expert services and attorneys consulted in addition to main counsel. Counterplaintiffs therefore asked that Trossman's fee petition be "denied in the amount requested," or, "[i]n the alternative, *** that the court hold an evidentiary hearing" so that counterplaintiffs could cross-examine Trossman's attorneys regarding the reasonableness and necessity of their fees.

On October 21, 2003, the circuit court granted Trossman's request for attorney fees and costs, "with the exception of attorney fees requested related to Counts IV, V and VI of

Trossman's First Amended Complaint."[10] The court further ordered that "Trossman shall serve on the defendants and counterplaintiffs the breakdown of the attorney fees and costs granted by the Court and the attorney fees denied by the Court, with a courtesy copy to the Court ***."

On November 3, 2003, without ever holding an evidentiary hearing, the circuit court entered an order, stating that,

"having considered the time entries submitted by Trossman pursuant to the October 21, 2003 Order that set forth the attorney fees related to or that potentially related to Counts IV, V and VI of Trossman's First Amended Complaint, which time entries were copied verbatim from the attorney bills submitted with Don C. Trossman's Petition for Attorney Fees and Costs"

it was reducing the amount requested in Trossman's petition by $37,460 "as it relates to Counts IV, V and VI of Trossman's First Amended Complaint" and granting Trossman's supplemental attorney fees and costs in the amount of $39,540.67 incurred in connection with bringing and briefing the fee petition. The court consequently entered final judgment for Trossman and against counterplaintiffs, jointly and severally, in the amount of $447,805,72. Additionally, in order to allow entry of a final and appealable order on all issues in this litigation, the circuit court granted with prejudice Trossman's motion to voluntarily dismiss the only unresolved count of his

---

[10]As noted, these counts did not seek contribution under the indemnity and contribution agreement. Counterplaintiffs prevailed on counts IV and V, and Trossman voluntarily dismissed count VI. Trossman does not contest the exclusion of the fees and costs pertaining to these counts.

complaint, count VI,[11] "but without prejudice as to Trossman's ability to raise the same allegations set forth in Count VI as an affirmative defense to counterplaintiffs' counterclaim *** in the event an appeal is taken in this cause and the order granting summary judgment in favor of Trossman on the counterplaintiffs' counterclaim *** is vacated or reversed." (In count VI, Trossman, as noted, alleged that counterplaintiffs had breached an oral agreement to maintain the LaSalle loan in good standing.) Lastly, the court found that "[a]ny pending motions for rehearing filed by Trossman are hereby withdrawn," and "[t]his Order and Final Judgment is final and appealable as to the entire cause of action."

On December 1, 2003, counterplaintiffs filed a motion to reconsider the circuit court's orders of November 22, 2002, and November 3, 2003—thus, in essence, attempting to reargue the entire disposition of the counterclaim. In that motion to reconsider, counterplaintiffs argued for the first time that Trossman was barred, under the general estoppel principles, from asserting in the course of the litigation his defense that the corporate payments made by TPC did not trigger the right to contribution because the co-guarantors were counterplaintiffs individually. On February 26, 2004, the circuit court denied the motion for reconsideration. On the same day, counterplaintiffs filed a notice of appeal.

---

[11]Count III was earlier resolved in Trossman's favor, count VII was mooted by the disposition of the counterclaim, and count VIII, for attorney fees and costs in the event Trossman prevailed on claims or defenses in connection with the indemnity and contribution agreement, was duplicative of Trossman's subsequent petition for attorney fees and costs brought upon the resolution of the counterclaim in his favor—and was therefore also resolved.

ANALYSIS

On appeal, counterplaintiffs urge that we vacate the June 12, 2001, order of the circuit court granting Trossman's motion for reconsideration, the November 22, 2002, order granting Trossman's motion for summary judgment on the counterclaim, and the November 5, 2003, order awarding Trossman $447,805,72 in attorney fees and costs. Counterplaintiffs further ask that we reinstate the earlier order of Judge Neville granting summary judgment in their favor on the counterclaim as to Trossman's liability and remand the matter for further proceedings with respect to their attorney fees and costs. Counterplaintiffs maintain that Trossman must contribute his *pro rata* share under the indemnity and contribution agreement because (1) the payments made by TPC to LaSalle were made to satisfy counterplaintiffs' obligations as co-guarantors of the Wysteria loan; and (2) each check written by TPC represented individual contributions of each of the owners of TPC, namely, the Philipsborns and Lynch, because "TPC's money was defendants' money." Trossman, for his part, maintains that the right to contribution was not triggered by the virtue of TPC's payments to LaSalle because those payments were not made by counterplaintiffs in their individual capacities.

Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits on file, viewed in the light most favorable to the nonmovant, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2002). Although the use of summary judgment aids in the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation and is proper only when the resolution of a case hinges on a question of law and the moving party's right to

27

judgment is clear and free from doubt. In re Estate of Hoover, 155 Ill. 2d 402, 410, 615 N.E.2d 736, 739 (1993). Summary judgment is inappropriate where the record indicates the presence of triable issues of material fact. Estate of Hoover, 155 Ill. 2d at 411, 615 N.E.2d at 739-40. Moreover, where doubt exists as to the right to summary judgment, "the wiser judicial policy is to permit resolution of the dispute by a trial." Jackson Jordan, Inc. v. Leydig, Voit & Mayer, 158 Ill. 2d 240, 249, 633 N.E.2d 627 (1994). Our review of a grant of summary judgment is *de novo*. Estate of Hoover, 155 Ill. 2d at 411, 615 N.E.2d at 740. We construe the evidence in the record strictly against the movant and liberally in favor of the nonmovant. Estate of Hoover, 155 Ill. 2d at 410-11, 615 N.E.2d at 739-40.

As a preliminary matter, counterplaintiffs urge that, under the general principles of equitable estoppel, as well as under the principles of the "mend the hold" doctrine, Trossman is precluded from altering the reasons he asserted before the commencement of this litigation in defense of his refusal to contribute as a co-guarantor to the payments made by TPC. Consequently, counterplaintiffs contend that Trossman is barred from now arguing that the corporate payments made by TPC did not trigger the right to contribution of the individual guarantors who co-signed the guaranty in connection with the Wysteria loan. Counterplaintiffs assert that Trossman knew for years "about the payments he was refusing to make, and how defendants were meeting LaSalle'[s] calls on the Guaranty, yet for over thirty months, he never objected or informed them that he considered their method of payments to be ineffective or in error in any way." Counterplaintiffs are referring to the fact that, although in late 1994 and early 1995 Trossman did object to making contribution, his objections were principally grounded in

28

his belief that he was entitled to a substantial *pro rata* credit of the earlier payments made by PDC, and that his credit by far exceeded the amount counterplaintiffs claimed he owed in contribution.[12] Only in September of 1997, after discovery showed that TPC was not being reimbursed by counterplaintiffs for making payments to LaSalle, did Trossman, in response to counterplaintiffs' motion for summary judgment, raise the issue that TPC's payments could not be attributed to counterplaintiffs for the purpose of triggering the right to contribution.

Trossman points out, and we agree, that counterplaintiffs waived any arguments predicated upon the general principles of equitable estoppel or upon the mend the hold doctrine because they failed to raise them prior to filing their motion for reconsideration. See <u>Holzer v. Motorola Lighting, Inc.</u>, 295 Ill. App. 3d 963, 978, 693 N.E.2d 446 (1998) ("one may not raise a legal theory for the first time in a motion to reconsider"). Moreover, the record shows that in a letter dated November 30, 1994, in one of his early responses to counterplaintiffs' demands for contribution, Trossman did in fact articulate among his reasons for nonpayment his position that the payments by the corporate entity, TPC, were not sufficient to trigger the right to contribution, even though counterplaintiffs were owners and shareholders of TPC. Even that aside, counterplaintiffs would not prevail under either the equitable estoppel doctrine or the mend the hold doctrine because both doctrines require the party asserting them to make a showing of detriment, unfair prejudice or surprise, which is lacking here.

---

[12]As noted, counterplaintiffs seek contribution with respect to the payments made in February of 1995 and beyond, after LaSalle, in response to Lynch's phone call, began to send the guarantors monthly letters demanding payment of past due installments.

No. 1-04-0588

Equitable estoppel is typically invoked "where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct." Geddes v. Mill Creek Country Club, Inc., 196 Ill. 2d 302, 313, 751 N.E.2d 1150, 1157 (2001). The practical effect of equitable estoppel is to bar that person "from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." Geddes, 196 Ill. 2d at 313, 751 N.E.2d at 1157.

"To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." Geddes, 196 Ill. 2d at 313-14, 751 N.E.2d at 1157.

Counterplaintiffs do not argue that Trossman misled them by stating he would send contribution payments. In fact, as noted, Trossman repeatedly responded that he did not owe contribution. Rather, counterplaintiffs argue that they relied to their detriment on the principal reason

30

Trossman gave for his nonpayment, which is different from the reason he subsequently articulated in response to counterplaintiffs' motion for summary judgment and has adhered to ever since. Even if that contention were true, counterplaintiffs cannot claim that their reliance on Trossman's failure to fully articulate his objection to corporate payments by TPC was reasonable. In Geddes, our supreme court acknowledged:

> " 'Estoppel may arise from silence as well as words. It may arise where there is a duty to speak and the party on whom the duty rests has an opportunity to speak, and, knowing the circumstances, keeps silent. [Citations.] It is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain.' " Geddes, 196 Ill. 2d at 314, 751 N.E.2d at 1157, quoting Bondy v. Samuels, 333 Ill. 535, 546, 165 N.E. 181 (1929).

Regarding Trossman's duty to speak, it must be remembered that by 1994 Trossman was no longer an officer or shareholder of TPC. His duty to speak could only come from seeing counterplaintiffs about to commit an act infringing upon his right. That he did by informing them that he would not make contribution payments until the credit he believed was due to him was exhausted. Counterplaintiffs therefore had to think that Trossman would *not* make the contribution payments he was requested to make. Under the principles of equitable estoppel, having stated that he would not pay contribution, Trossman owed them no further explanation. In this respect, we further note that although

> " '[E]stoppel may arise from silence as well as words, *** it can arise by

31

silence only where there is knowledge of the facts on one side and ignorance on the other; if the means of knowledge are equally open to both parties, there can be no estoppel. ***

A person is not estopped by his silence where there is no positive duty *** to speak, or the party is in ignorance of his rights.' " Town & Country Bank of Springfield v. James M. Canfield Contracting Co., 55 Ill. App. 3d 91, 95, 370 N.E.2d 630, 633 (1977), quoting S. Puterbaugh, Chancery Pleading and Practice §675, at 1372 (7th ed. 1930).

Put differently, " '[a] party claiming the benefit of an estoppel cannot shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others.' " Town & Country Bank, 55 Ill. App. 3d at 95, 370 N.E.2d at 633, quoting Vail v. Northwestern Mutual Life Insurance Co., 192 Ill. 567, 570, 61 N.E. 651 (1901). Here, counterplaintiffs cannot claim that Trossman, who was no longer affiliated with TPC, had superior knowledge of material facts related to TPC's payments to LaSalle. In addition, the means of ascertaining the legal effect of those payments were equally available to Trossman and to counterplaintiffs, in that they both could have sought legal counsel. Nothing in Trossman's conduct discouraged counterplaintiffs from doing so. Counterplaintiffs, accordingly, may not rely on the equitable estoppel theory.

Counterplaintiffs nevertheless argue that, even if not barred by the principles of equitable estoppel, Trossman would be barred by the mend the hold doctrine from changing the ground for his refusal to pay contribution. The mend the hold doctrine has traditionally been referred to in

the following terms:

> "Where a party gives a reason for his conduct and decision touching anything
> involved in a controversy, he cannot, after litigation has begun, change his ground
> and put his conduct upon another and different consideration. He is not permitted
> thus to amend his hold. He is estopped from doing it by a settled principle of
> law." County of Schuyler v. Missouri Bridge & Iron Co., 256 Ill. 348, 353, 100
> N.E. 239 (1912).

Accord Gibson v. Brown, 214 Ill. 330, 341, 73 N.E. 578 (1905); Townsend v. Postal Benefit

Ass'n of Illinois, 262 Ill. App. 483, 489 (1931). In modern times, the mend the hold doctrine has

been described "as a corollary of the duty of good faith that the law of Illinois as of other states

imposes on the parties to contracts" and precludes "[a] party who hokes up a phony defense to

the performance of his contractual duties" from "[trying] on another defense for size." Harbor

Insurance Co. v. Continental Bank Corp., 922 F.2d 357, 363 (7th Cir.1990).

From a procedural standpoint, the doctrine has been criticized for embodying "an

antithetical conception of the litigation process, one in which a party is expected to have all his

pins in perfect order when he files his first pleading." Harbor Insurance, 922 F.2d at 364.

Reflecting that concern, this court held:

> "Although the law on the 'mend the hold' doctrine is unclear, it seems to
> apply only in summary judgment and trial proceedings. There is no case law that
> clearly holds that the doctrine applies at the pleading stage. In accordance, we
> decline to apply the 'mend the hold' doctrine to the pleading stage." Delaney v.

33

No. 1-04-0588

Marchon, Inc., 254 Ill. App. 3d 933, 941, 627 N.E.2d 244, 249 (1993). We note, however, that Delaney has been criticized for being inconsistent with our supreme court's decision in Schuyler County in limiting the doctrine's reach to statements made in postpleading stages of litigation. See R. Sitkoff, Comment, *"Mend the Hold" and Erie: Why an Obscure Contracts Doctrine Should Control in Federal Diversity Cases*, 65 U. Chi. L. Rev. 1059, 1078 n.109 (1998). In that regard, we note that we remain bound by supreme court precedent regardless of age. See generally People v. Suarez, 224 Ill. 2d 37, 862 N.E.2d 977 (2007); see also Walberg v. St. Francis Home, Inc., 274 Wis. 2d 414, 419, 683 N.W. 2d 518, 520 (2004) ("We are bound by supreme court precedent, even if it is over a century old"); Gilliam v. Stewart, 291 So.2d 593, 594 (Fla. 1974) ("When the district courts decide that ancient precedents should be overruled, we welcome their views and such should be unhesitatingly rendered but, in cases such as this, it is the duty of the district courts under the plain constitutional language to adhere to the former precedents and then certify the decision to us. This will assure uniformity").

Most of the other decisions of this court on the subject do not restrict the mend the hold doctrine in this fashion.[13] However, these decisions recognize that the mend the hold doctrine would not apply under certain circumstances out of equitable, rather than procedural, considerations. For instance, in Larson v. Johnson, 1 Ill. App. 2d 36, 46, 116 N.E.2d 187, 192, which contains a comprehensive and scholarly historical analysis of the doctrine and which was

---

[13]But see Israel v. National Canada Corp., 276 Ill. App. 3d 454, 462, 658 N.E.2d 1184 (1995), stating, without citation to authority, that "Illinois law requires a defendant in a breach of contract claim to stand by the first defense raised *after litigation has begun*." (Emphasis added.)

34

recognized as authoritative on the subject (See Harbor Insurance, 922 F.2d at 363), this court stated that a court should not apply the mend the hold doctrine where it would be inequitable to do so, such as where the new defense was "meritorious and equitable" and was not raised "by inadvertence or the casual character of the repudiation or the circumstances under which it occurred." Larson, 1 Ill. App. 2d at 46, 116 N.E.2d at 192. The court in Larson explained that the mend the hold doctrine developed to redress unfair and arbitrary conduct of the repudiating party. Larson, 1 Ill. App. 2d at 46, 116 N.E.2d at 192. Similarly, in Townsend, this court indicated that detriment was one of the doctrine's components. Townsend, 262 Ill. App. at 488 ("When appellee elected to place its defense on the ground that the insured was not a member at the time of her death it will not be permitted, *after costs and expenses have been incurred in prosecuting the action*, to mend its hold and set up other defenses, even though at the outset such other defenses may have been available" (emphasis added)). Most recently, this court refused to apply the doctrine in the absence of unfair surprise or arbitrariness. Smith v. Union Automobile Indemnity Co., 323 Ill. App. 3d 741, 746-47, 752 N.E.2d 1261 (2001); William J. Templeman Co. v. United States Fidelity & Guaranty Co., 317 Ill. App. 3d 764, 771-72, 739 N.E.2d 883 (2000).[14]

Under the facts of the instant case, we do not find that it was inequitable for the circuit court to allow Trossman to assert, as the ground for his nonperformance under the indemnity and contribution agreement, that TPC's payments were not made by counterplaintiffs in their

---

[14]Thus, the holding of Delaney may be seen as predicated on the absence of prejudice due to the shifting of position in the early stages of litigation.

individual capacities. Counterplaintiffs cannot claim to be prejudiced when, after discovery showed that TPC was not being reimbursed by counterplaintiffs for its payments to LaSalle, Trossman formally articulated this ground in his amended pleading, months before the argument on counterplaintiffs' motion for summary judgment took place. As discussed in our equitable estoppel analysis, counterplaintiffs cannot otherwise claim to be prejudiced due to knowing only of Trossman's refusal to pay contribution, but not of the exact grounds he would subsequently raise in litigation. Either way, counterplaintiffs' recourse would have been to sue for contribution, which is precisely what they did. Nor can it be said that Trossman acted in bad faith in voicing the initial ground for his refusal to pay contribution, especially given that Trossman did, in a letter, dated November 30, 1994, express his view that the corporate payments made by TPC did not trigger his right to contribution. As previously noted, that letter stated in pertinent part, "If The Philipsborn Company advanced the funds, as you say, then you have created a 'third party' loan for which I have no liability." Thus, even in the absence of waiver, we would conclude that counterplaintiffs cannot prevail under the doctrines of equitable estoppel or mend the hold because they failed to show detriment, unfair surprise or prejudice.

Counterplaintiffs next argue that Judge Neville's rulings were law of the case and should not have been set aside. As Trossman points out, the law of the case argument has been waived because it was not raised in the proceedings below. In any event, the law of the case doctrine would not bar Judge Henry from reconsidering Judge Neville's prior rulings. As counterplaintiffs acknowledge, the law of the case doctrine—which provides that "a rule established as controlling in a particular case will continue to be the law of the case" in the absence of error or a change in

facts—is ordinarily applicable upon remand, where the final ruling of the circuit court was unchallenged or affirmed on appellate review. People v. Patterson, 154 Ill. 2d 414, 468, 610 N.E.2d 16, 41 (1992); Kennedy v. First National Bank of Mattoon, 259 Ill. App. 3d 560, 563, 631 N.E.2d 813 (1994). We underscore that "a finding of a final judgment is required to sustain application of the doctrine." Patterson, 154 Ill. 2d at 469, 610 N.E.2d at 41. Counterplaintiffs ultimately concede that interlocutory rulings "may be reviewed, modified, or vacated by successor judges at any time before final judgment" (Thomas v. Johnson Controls, Inc., 344 Ill. App. 3d 1026, 1031, 801 N.E.2d 90 (2003), citing Balciunas v. Duff, 94 Ill. 2d 176, 185, 446 N.E.2d 242 (1983)).

As Trossman points out, Judge Neville's grant of partial summary judgment in counterplaintiffs' favor was interlocutory due to the pendency of two motions for reconsideration, which, as we determined in the prior appeal in this matter, precluded finality and appealability of that judgment despite a Rule 304(a) certification. On remand, Trossman renewed his motions for reconsideration before Judge Henry, since Judge Neville had retired. Under such circumstances, Judge Henry had the power to vacate the rulings he considered erroneous, provided he did so after careful consideration. See Balciunas, 94 Ill. 2d at 186, 446 N.E.2d at 246 ("judge shopping" is discouraged; however, where the record shows no impropriety in the assignment of the case to a successor judge, the successor judge may vacate or amend those orders entered by his predecessor which he considers to be erroneous). In this regard, the record shows that this matter was fully rebriefed before Judge Henry. The briefing revealed the presence of genuine issues of fact as to whether counterplaintiffs committed a willful and wanton act in causing

LaSalle to collect on the guaranty, which would have the effect of absolving Trossman of his contribution obligation, and whether material modifications, without notice to Trossman, to the Wysteria project rendered the guaranty unenforceable against him. Under these circumstances, Judge Henry's reversal of the grant of summary judgment in counterplaintiffs' favor would not have been improper. In fact, for the reasons discussed below, Trossman too is not entitled to summary judgment on the counterclaim because of the presence of genuine issues of fact.

Moving on to the substantive merits, we note that the parties do not dispute that the right to contribution does not arise unless and until there is a default. In this respect, they are correct. See Kreizelman v. Stevens, 311 Ill. App. 161, 168, 35 N.E.2d 532 (1941) ("no liability may be imposed upon the guarantor unless and until the principal debtor has defaulted ***. *** Plaintiff has not called our attention to a single case nor have we been able to find one where the guarantor has been held liable on his guaranty unless the principal debtor was in default"), *aff'd*, 381 Ill. 73, 76 (1942) ("There must be an allegation in the complaint that the [note] had matured, coupled with an allegation that the principal obligor is in default in order to place a liability on the part of the guarantor"). As noted, Trossman questioned in the proceedings below whether the default had indeed occurred, given that: Ziebart, a senior vice-president at LaSalle, testified that although the interest payments on the loan were late, the loan, to her knowledge, had never been declared in default; Lynch, similarly, testified that although he understood the loan to be in default "for brief periods of time" when the interest and real estate taxes were not timely paid, he admitted that, as of the time this deposition was taken in October of 1996, LaSalle was still "funding" the Wysteria loan; and at the time the loan modification agreement was entered into on

38

April 1, 1997, each party to the agreement ratified the Wysteria loan and represented that

"the Amended Loan Instruments are in good standing and remain in full force and

effect as so amended ***. Each party to this Agreement acknowledges that, after

giving effect to this Agreement, to the best of his knowledge no Event of Default

or event which, with the passage of time, the giving of notice, or both, would

constitute an Event of Default, has occurred and is continuing."

Nevertheless, although LaSalle had apparently not formally called the loan in default and exercised its option to accelerate payment, that is not dispositive of the issue of default, as the law looks to the underlying loan agreement for what constitutes a default. See Peirce v. Conant, 47 Ill. App. 2d 294, 301, 198 N.E.2d 555 (1964). According to the terms of the Wysteria loan, a default occurs if any payment is more than five days past due. The record shows that, after Lynch telephoned LaSalle in late 1994, and informed it that no further payments would be made on the Wysteria loan absent a written demand, late payments (more than five days past due) were made by TPC on numerous occasions, corresponding with the fact that LaSalle would send its monthly demand letters after the due date of each payment. Where, as here, a guarantor unconditionally guarantees punctual payment of principal and interest and waives a notice of default, a notice of the taking of any action in connection with the loan, or any other applicable notice, as well as waives presentment and demand, any failure in making timely payments triggers the guarantor's obligations. See BA Mortgage & International Realty Corp. v. American National Bank & Trust Co. of Chicago, 706 F. Supp. 1364, 1374 (N.D. Ill. 1989) ("As for the unconditional Guaranty itself, it embraces 'the due and punctual payment of the principal ***

[and] interest.' That means any default in payment triggers the [guarantors'] obligation, and in classic guaranty language they specifically waived all preconditions to that obligation: 'diligence, presentment, protest, notice of dishonor, [or] demand for payment' "); see also <u>LeRoy State Bank v. J. Keenan's Bank</u>, 337 Ill. 173, 182-83, 169 N.E. 1 (1929) ("A guarantor may impose any terms or conditions on his guaranty which he may choose and will only be liable according to the terms of the agreement. If he guarantees payment unconditionally and payment is not made, then he is liable on his guaranty"). Therefore, Trossman cannot claim that the guaranty was not triggered. It was triggered each time a payment was past due, albeit with respect to that payment only, as opposed to the entire balance of the loan, which, under the terms of the guaranty in this case, would not be accelerated in the absence of an express election by LaSalle to do so. See <u>Phoenix Acquisition Corp. v. Campcore, Inc.</u>, 81 N.Y.2d 138, 141-42, 596 N.Y.S.2d 752, 612 N.E.2d 1219, 1220 (1993).

Trossman, nevertheless, maintains that counterplaintiffs are not entitled to contribution because the payments to LaSalle, even if made in satisfaction of the guaranty, were made by TPC in its corporate capacity and not counterplaintiffs in their individual capacities.[15]

It is well established that the right to contribution between co-guarantors is based upon principles of equity (<u>Weger v. Robinson Nash Motor Co.</u>, 340 Ill. 81, 94, 172 N.E. 7 (1930); <u>Trego v. Estate of Cunningham</u>, 267 Ill. 367, 373, 108 N.E. 350 (1915); <u>Golsen v. Brand</u>, 75 Ill.

---

[15]As noted, although the indemnity and contribution agreement provided for credit to the individual shareholders of TPC for payments made by *PDC*, it contained no similar provision with respect to payments made by TPC.

148 (1874); Harris v. Handmacher, 185 Ill. App. 3d 1023, 1026, 542 N.E.2d 77 (1989)), although

that right may be modified by contract (Exchange Elevator Co. v. Marshall, 147 Neb. 48, 59, 22

N.W.2d 403, 410 (1946); R. Lord, Williston on Contracts §36:14 (4th ed. 1999)).  It has been

said:

> "The right of contribution is an individual and personal right.  It grows out of
>
> what the individual himself does. *** Each one paying is entitled to recover from
>
> the others the amount which he has paid in excess of his own proportionate part.
>
> His right to recover is dependent upon the excess which he himself pays.  In other
>
> words, the act is individual, and the right of contribution is individual."  Exchange
>
> Elevator Co., 147 Neb. at 61-62, 22 N.W.2d at 411.

See also Fithian v. Jamar, 286 Md. 161, 169, 410 A.2d 569, 573-74 (1979) ("this right to

contribution is an inchoate claim which does not ripen into being unless and until [a co-

guarantor] pays more than her proportionate share to [the creditor]").

Counterplaintiffs urge that the right to contribution was triggered because payments made

by TPC to LaSalle were made to satisfy the Philipsborns' and Lynch's obligations as co-

guarantors of the Wysteria loan.  However, the indemnity and contribution agreement, by its very

terms, is triggered when "Clarion and Bartok, Lynch, A. Philipsborn, T. Philipsborn or Trossman

contributes in excess of its respective Share of Obligations."  Although the agreement also

provides for *pro rata* attribution of payments made by PDC, it does not contain any provisions

regarding the attribution of payments made by TPC.  Since the indemnity and contribution

agreement does not purport to address whether payments made by TPC may be attributed to the

individual shareholders-guarantors, we must turn to common law for guidance.

The law is clear that payments made by a corporation may not be attributed to individual shareholders because corporations and shareholders are distinct legal entities. This has been established in Sterling Radio, upon which Trossman relies. In Sterling Radio, Sterling Radio Stations, Inc. (SRS), entered into an agreement with WSDR, Inc. (hereinafter, the sellers), to buy a radio station in Sterling, Illinois. Pursuant to the agreement, SRS executed a promissory note to the sellers, which Alex R. Seith, a shareholder of SRS, guaranteed. SRS subsequently defaulted on the promissory note, and Seith refused to pay the note in his capacity as a guarantor. The sellers sued SRS and Seith in Whiteside County (the Whiteside action), and obtained a judgment against them, jointly and severally, in the amount of $778,460.38. At about the same time, SRS transferred substantially all of its assets to LH&S Communications, Inc. (LH&S). Seith became the largest shareholder of LH&S's common stock and also held a significant number of shares of LH&S's preferred stock. In response to SRS's transfer of its assets to LH&S, the sellers filed a suit in state court. Shortly thereafter, an involuntary petition under chapter 7 of the United States Bankruptcy Code (11 U.S.C. §§303, 701 et seq. (1994)) was filed against SRS in the bankruptcy court. The bankruptcy trustee challenged the transfer of SRS's assets to LH&S as a voidable preference. After learning that LH&S entered into an agreement to sell its assets for $3.25 million, the sellers, with the trustee's support, obtained a temporary restraining order preventing LH&S from distributing any proceeds from the sale. The parties ultimately agreed to settle their dispute. The settlement agreement provided that LH&S would pay the sellers $300,000 in satisfaction of the $778,460.38 judgment owed by SRS and Seith, as well as pay the

bankruptcy trustee $625,000 to settle other debts of the bankrupt entity. Meanwhile, SRS and Seith filed a malpractice suit against the attorneys who had represented them in the Whiteside action that resulted in a $778,460.38 judgment entered against them. In the malpractice action, Seith contended, in pertinent part, that he individually suffered $300,000 in damages when judgment was entered against him in the Whiteside suit. Seith argued that the $300,000 LH&S paid in satisfaction of the Whiteside judgment was actually his money because, as an LH&S shareholder, he was to receive between $900,000 and $1.2 million in distribution from the sale of LH&S's assets. Sterling Radio, 328 Ill. App. 3d at 60-61, 63, 765 N.E.2d 56.

This court rejected Seith's argument, stating:

"[T]he evidence reveals that all of the directors and shareholders of LH&S, including Seith, entered into an agreement with the trustee on behalf of LH&S that LH&S would satisfy Seith's judgment in return for the removal of the TRO and the continuation of the sale of its assets. This $300,000 payment came out of the assets of the corporation, not the assets of the individual shareholders. Thus, Seith suffered only a diminution of the value of his shares and not a loss of his personal funds." Sterling Radio, 328 Ill. App. 3d at 63, 765 N.E.2d at 61.

This holding reflects a well-established doctrine of the separateness of the shareholders from the corporation. See In re Rehabilitation of Centaur Insurance Co., 158 Ill. 2d 166, 172, 632 N.E.2d 1015 (1994) ("A corporation is a legal entity separate and distinct from its shareholders, directors, and officers"). Under this doctrine, the payments made by TPC may not be imputed to counterplaintiffs for the purpose of triggering the right to contribution.

In response, counterplaintiffs invoke the equitable remedy of reverse piercing the corporate veil. In support, counterplaintiffs rely on Crum v. Krol, 99 Ill. App. 3d 651, 435 N.E.2d 1081 (1981), which, in turn, relied on Roepke v. Western National Mutual Insurance Co., 302 N.W.2d 350 (Minn. 1981). In Crum, this court noted that "the doctrine of corporate separation 'is a legal theory used for the convenience of the business world' " and " 'cannot be extended to a point beyond its reason and policy.' " Crum, 99 Ill. App. 3d at 662, 435 N.E.2d at 1089, quoting Wikelund Wholesale Co. v. Tile World Factory Tile Warehouse, 57 Ill. App. 3d 269, 272-73, 372 N.E.2d 1022 (1978). Both Crum and Roepke recognized the fairness of allowing an "insider" to pierce the corporate veil from within the corporation under appropriate circumstances—which would allow the court to treat the "insider" and the corporation as a single entity, *i.e.*, impute the corporation's injury and/or expenditures to the insider individually. A court may reverse pierce the corporate veil when (1) an insider owns all, or substantially all, of the stock; (2) the insider treats the property as his own; and (3) no shareholder or creditor would be adversely affected. Roepke, 302 N.W.2d at 352. Counterplaintiffs urge that TPC—unlike the LH & S corporation in Sterling Radio, where the court did not consider the reverse piercing remedy—is susceptible to reverse piercing the corporate veil because counterplaintiffs collectively own 100% of TPC's stock. It appears that the other requirements for reverse piercing are met: namely, that counterplaintiffs collectively treat TPC as their own property, and no creditors would be adversely affected if Trossman were to pay contribution.

Trossman points out that counterplaintiffs did not ask in their pleadings to reverse pierce the corporate veil. Trossman argues that they are now barred from asserting this doctrine, citing

No. 1-04-0588

in support to <u>Bevelheimer v. Gierach</u>, 33 Ill. App. 3d 988, 992, 339 N.E.2d 299 (1975) ("A corporation is an entity separate from its shareholders and one who seeks to have the court apply an exception must seek that relief in his pleading and carry the burden of proving actual identity"). In other words, the party seeking to apply the exception must allege in his pleadings facts sufficient to form a basis for disregarding separate corporate identity. See <u>South Side Bank v. T.S.B. Corp.</u>, 94 Ill. App. 3d 1006, 1010, 419 N.E.2d 477 (1981). It is true that neither the amended counterclaim nor the exhibits attached thereto, which were copies of the guaranty and the indemnity and contribution agreement, gave any indication that counterplaintiffs would ask the circuit court to treat the payments made by TPC as if they were made by counterplaintiffs. In fact, the amended counterclaim gave an impression that the payments on the guaranty were made by counterplaintiffs individually. Nevertheless, in the course of the proceedings below, it was quickly brought to the court's attention that the payments at issue were made by TPC. Counterplaintiffs maintained in the course of the proceedings below that they were entitled to contribution because they regarded TPC's money as their own money. Under these circumstances, Trossman waived the pleading deficiency by failing to raise it in the lower court proceedings and, instead, addressing the issue of attribution of TPC's payments on the merits. See <u>Williams v. Alfred N. Koplin & Co.</u>, 114 Ill. App. 3d 482, 486, 448 N.E.2d 1042 (1983) ("While defendants assert that this is a new theory not pleaded in the trial court, any objection to the lack of specificity in pleading this allegation has been waived by defendants' failure to object below when the facts to support this theory were raised in plaintiff's affidavit and specific argument was made to the trial court on this basis by plaintiff in opposition to defendants' motion

45

for summary judgment").  Even if Trossman did not waive the pleading deficiency, "[t]he Code of Civil Procedure provides that technical defects in pleadings should not prevent the courts from doing justice between the parties."  Ragan v. Columbia Mutual Insurance Co., 183 Ill. 2d 342, 354, 701 N.E.2d 493 (1998), citing 735 ILCS 5/2-1005(g) (West 1994) (pleadings may be amended at any time after judgment to conform the pleadings to the proofs), 735 ILCS 5/2-612(c) (West 1994) (defects in form or substance of pleadings not objected to at trial are waived), and 735 ILCS 5/2-603(c) (West 1994) (pleadings are to be liberally construed to do substantial justice between the parties).  Indeed, in Crum, although Crum's pleadings suffered from the same deficiency as those of counterplaintiffs, the trial court reverse pierced the corporate veil to achieve justice between the parties.  Crum, 99 Ill. App. 3d at 659, 435 N.E.2d at 1087.

However, even though counterplaintiffs are not precluded from attempting at this juncture to establish a case for reverse piercing of the TPC corporate veil, it cannot avail them under the pronouncement of our supreme court in Centaur, 158 Ill. 2d at 173-74, 632 N.E. 2d at 1018, as recently reaffirmed by our supreme court in Forsythe v. Clark, No. 101570 (Ill. Feb. 16, 2007).

In Centaur, our supreme court stated:

"'Generally, the corporate veil is never pierced for the benefit of the corporation or its stock holders ***.' (18 Am. Jur. 2d Corporations § 45, at 846 (1985)).  And, as another source, in noting that reverse piercing (where the parent company asserts that the subsidiary is not really a separate entity) is not favored,

states: '[T]he rules relating to piercing of the corporate veil are designed to protect those relying on the existence of a distinct corporate entity ***.' 18 C. J. S. Corporations § 12, at 282 (1990).

We agree with these statement of law and do not expand the doctrines of alter ego and piercing the corporate veil to include a subsidiary's bringing an action against its parent corporation. As one court has noted:

'[T]he general law mandates that the piercing of a corporate veil must never be made to the benefit of the corporation or its shareholders. It is troublesome, in this court's view, to allow a corporation, through its trustee, to pierce its own veil since it would have the effect of denying the corporation of its own corporate existence.' (In re Dakota Drilling, Inc. (D. N.D. 1991), 135 Bankr. 878, 844)." See Centaur, 158 Ill. 2d at 173-74, 632 N.E. 2d at 1018.

This statement explicitly rejects the use of reverse piercing from within to benefit the corporate subsidiary or the corporate shareholders. In its response to this petition for rehearing filed by the plaintiff in this cause, counterplaintiffs would encourage this court to confine the holding in Centaur to narrow facts. Those facts involve an attempt by the insurance liquidator to pierce the corporate veil between the insurance company and its parent, Borg Warner, in order to reach the assets of its parent corporation. However, counterplaintiffs offer little if any rationale to distinguish between an attempt by a subsidiary through the rehabiliator to reach the assets of

the parent as opposed to a similar action by shareholders albeit to recover for advances made by the corporations, to satisfy the suretyship obligation.

The repudiation by our supreme court of reverse piercing as acceptable application of the piercing of the corporate veil doctrine was vigorously reaffirmed by our supreme court in its recent decision in Forsythe. There, plaintiff, an employee of a refinery owned by a subsidiary of the defendant, was killed by a fire on the job for which his estate received a workman's compensation award from his employer. His estate then sued defendant, the parent of his employer, for negligence under a "direct participant theory," alleging that the parent directly controlled the underlying actions of its subsidiary, which negligently caused the subsidiary to forego safety requirements which would have prevented the decedent's demise. The parent sought, among other defenses, to pierce the veil between it and its subsidiary so as to immunize itself from liability under the exclusive remedy provision of the Workman's Compensation Act (820 ILCS 305/5 (West 2003)). In rejecting the parent company's attempt to pierce the corporate veil of its subsidiary, our supreme court stated:

> "In essence, defendant is requesting that it be allowed to pierce its own corporate veil in order to avoid liability. Illinois courts have consistently expressed reluctance for allowing such a practice. See Centaur, 158 Ill. 2d at 173-74 (citing with approval the principle that the general law mandates that piercing must never be made in favor of a corporation or its shareholders); Main Bank of Chicago v. Baker, 86 Ill. 2d 188, 206, 427 N.E.2d 94, 102 (1981) (stating that a party 'cannot assert the equitable doctrine of piercing the corporate veil to disregard the separate corporate existence of a corporation

he himself created to gain an advantage which would be lost under his present contention'); see Hughey v. Hoffman Rosner Corp., 109 Ill. App. 3d 633, 636, 440 N.E.2d 1049, 1051 (1982); Schmidt v. Milburn Brothers Inc., 296 Ill. App. 3d 260, 267, 694 N.E.2d 624 (1998). The appellate court in this case recognized this point when it rejected defendant's attempt 'to have its cake and eat it too: asserting, on the one hand, that it was merely a shareholder in arguing that it owed no duty to the decedents, while at the same time, attempting to invoke the Act's grant of immunity by characterizing itself as the decedents' employer.' 361 Ill. App. 3d at 651-52." Forsythe, No. 101570, slip. op. at 8-9 (Ill. Feb. 16, 2007).

Even if the holdings in Centaur and Forsythe were narrowly restricted to their specific facts, as urged by counterplaintiffs, the quoted broad-based and explicit rejection of reverse piercing by our supreme court in Centaur as reaffirmed in Forsythe must be followed. See Cates v. Cates, 156 Ill. 2d 76, 80, 619 N.E.2d 715, 717 (1993) ("[A]n expression of opinion upon a point in a case argued by counsel and deliberately passed upon by the court, though not essential to the disposition of the cause, if *dictum*, is a judicial *dictum* (See Scovill Manufacturing Co v. Cassidy, 275 Ill. 462, 470 (1916); Rhodas v. Chicago & Alton R.R. Co., 227 Ill. 328, 337 (1907); Law v. Grommes, 158 Ill. 492, 494 (1895); see also 21 C.J.S. Courts § 142 (1990) (such *dictum* should be considered a judicial *dictum* as distinguished from a mere *obiter dictum*)). *** [A] judicial *dictum* is entitled to much weight, and should be followed unless found to be erroneous. [Citations]. Even *obiter dicutm* of a court of last resort can be tantamount to a decision and therefore binding in the absence of a contrary decision of that court.")

49

Thus, without having an available remedy in reverse piercing, the holding in Sterling Radio as applied by the trial court controls. Consequently, the corporate payments advanced by TPC cannot trigger a right of contribution on behalf of the counterplaintiffs, and the judgment of the circuit court in that regard, precluding the counterplaintiffs' action seeking contribution, must be affirmed. See Bevelheimer, 33 Ill. App. 3d at 992, 339 N.E.2d at 303.

We further note that even if reverse piercing would otherwise have been an available remedy in Illinois, the right of counterplaintiffs to contribution would remain questionable and necessitate a remand. Trossman would be free to contend on remand that counterplaintiffs' right to contribution could be defeated by their inequitable conduct towards their cosurety.

Although Trossman voluntarily dismissed count VI of his complaint, which alleged that counterplaintiffs breached an oral agreement to keep the LaSalle loan in good standing, these allegations, pursuant to Judge Bartkowicz's order of November 3, 2003, are available to Trossman as affirmative defenses to the counterclaim. Accordingly, if Trossman is correct, as he repeatedly argued below, that there was an understanding reached in late 1990, before he signed the guaranty, between himself and TPC, PDC, the Philipsborns and Lynch, pursuant to which TPC would channel funds to PDC to make all required payments in connection with the Wysteria project to keep the LaSalle loan in good standing, that understanding could serve as an affirmative defense precluding reverse piercing if reverse piercing were otherwise available. See Restatement of Restitution §81, at 360 (1937) ("a person who has discharged more than his proportionate share of a duty owed by himself and another *** is entitled to contribution from the other, except where the payor is barred by the wrongful nature of his conduct").

50

No. 1-04-0588

The Restatement of Security further explains:

"The right to contribution depends upon equitable principles. If the conduct of a cosurety is responsible for increasing the ultimate liability of another cosurety, it would be inequitable to allow him to recover as much as would otherwise have been allowed. Conduct which will reduce the amount a cosurety can recover is not necessarily fraudulent. The motives of the cosurety may be honest and yet the effect of his conduct may be to reduce the amount otherwise available to the creditor." Restatement of Security §161, Comment *a*, at 448 (1941).

See also Restatement of Security § 161, at 448 (1941):

"Where the conduct of a surety causes the default of the principal or cosurety or decreases the amount that would otherwise have been available from the principal or a cosurety, his right to contribution from the cosureties is proportionately diminished."

In In re Estate of Koch, 148 Wis. 548, 134 N.W.663 (1912), the Supreme Court of Wisconsin noted that the foregoing principles

"are so well entrenched, as of legal as well as equitable cognizance, that modern text-writers turn the matter off by the mere statement that 'the right to contribution may be destroyed *** by the fault of the party who causes the loss toward which he seeks contribution from his co-obligor.' 9 Cyc. 804." Estate of Koch, 148 Wis. at 560, 134 N.W. at 668.

More specifically, the court in Estate of Koch stated that, especially where a cosurety is an

51

officer of the principal corporation:

> "both in law and equity, a cosurety is a *quasi* trustee for his associates of all special advantages he acquires from the principal debtor *** for the benefit of the bearers of the common burden, with all the duties incident to such relation. *** He is liable for loss proximately caused to his associates by failure to honestly and with reasonable care perform his legal duty to his associates,—to reasonably conserve his special advantages for the common benefit ***." Estate of Koch, 148 Wis. at 560, 134 N.W. at 668.

And:

> "If he dishonestly or negligently rendered the primary source for discharging guaranteed debts insufficient therefor, he breached his duty to his cotrustee and incurred the legal, equitable and moral liability to lose his inchoate right of contribution. *There is no rule better established in the law of suretyship than that, the cosurety whose wrongful conduct causes default, rendering resort to the guaranty necessary, and producing loss to the sureties, cannot have contribution, so far as the loss was thus produced*." (Emphasis added.) Estate of Koch, 148 Wis. at 568, 134 N.W. at 671.

Counterplaintiffs have denied ever reaching any understanding with respect to having TPC shield the individual guarantors from exposure to personal liability–thus raising an issue of fact as to what understanding was reached, if any, outside the four corners of the indemnity and contribution agreement. Counterplaintiffs, however, have asserted below that the existence of

such an understanding is irrelevant in the face of the parol evidence rule, which would preclude any such oral understanding from modifying the written terms fo the indemnity and contribution agreement. Contrary to counterplaintiffs' contention, an oral commitment, even if not contractually binding, may form a basis for estoppel. See Dickens v. Quincy College Corp., 245 Ill. App. 3d 1055, 1062, 615 N.E.2d 381 (1993) (where an oral contract is unenforceable under the statue of frauds, the defense of equitable estoppel is nevertheless available and requires the plaintiff to plead and prove misrepresentation on the part of the defendant); Fields v. General Motors Corp., 121 F. 3d 271 (7th Cir. 1997) (where an alleged oral contract was unenforceable due to the running of the statute of limitations, the court could still consider the defendant's statements insofar as they pertained to equitable considerations implicated in the case).

In this context, the end result of the operation of estoppel would be the denial of contribution. See R. Lord, Williston on Contracts §61:64, at 234 (4th ed. 1999) (the right to contribution may be defeated by "some contract between [the parties] or some equitable consideration"); Ayer v. Tilton, 42 N.H. 407, 417 (1861), quoting Peck v. Ellis, 2 Johns. Ch. 136, ___ (" 'a court of law will sustain an action for contribution between two *** sureties under an implied assumpsit arising from the general principle that equality is equity. But contribution between wrong doers will not be enforced' "); Morgan v. Morgan, 158 Ky. 830,166 S.W. 602 (1914) (a surety who misleads his co-surety in a respect that prevents the co-surety from protecting himself from loss may be estopped from claiming contribution); Milner v. Eskridge, 62 Colo. 430, 439, 163 P. 1115, 1117-18 (1917) ("The doctrine of contribution between sureties rests on principles of equity, and will be applied only when it accords with justice. To allow

defendant in error, who induced, or aided in inducing, the plaintiff in error to lend his credit to the other signers of the note, which recited a deposit of accounts, and also, that stock was to be put up as collateral, to recover on the note thus signed, after having turned back the security to the company for its and his benefit, would be rank injustice").

However, since reverse piercing is not an available remedy in Illinois, the judgment of the circuit court denying counterplaintiffs right to seek contribution from the counterdefendant is affirmed outright without the necessity of a remand.

Nevertheless, we conclude that an evidentiary hearing is necessary with respect to the award of attorneys fees. We note that the parties disagree as to whether, under such circumstances, an evidentiary hearing on attorney fees and costs is a matter of right. Counterplaintiffs contend that an evidentiary hearing is required and failure to conduct one constitutes reversible error. In support, counterplaintiffs rely on, among other cases, Bank of America National Trust & Savings Ass'n v. Schulson, 305 Ill. App. 3d 941, 952, 714 N.E.2d 20 (1999), and Lasday v. Weiner, 273 Ill. App. 3d 461, 467, 652 N.E.2d 1198 (1995)—both holding that the failure to conduct an evidentiary hearing on attorney fees and costs constituted reversible error. Trossman, on the other hand, argues that an evidentiary hearing on a petition for attorney fees and costs is not required under Illinois law. In support, Trossman cites to Raintree Health Care Center v. Illinois Human Rights Comm'n, 173 Ill. 2d 469, 494-95, 672 N.E.2d 1136 (1996), Amadeo v. Gaynor, 299 Ill. App. 3d 696, 705, 701 N.E.2d 1139 (1998), Heritage Pullman Bank & Trust Co. v. Carr, 283 Ill. App. 3d 472, 481-82, 670 N.E.2d 814 (1996), and Aroonsakul v. Flanagan, 155 Ill. App. 3d 223, 229, 507 N.E.2d 1 (1987), *abrogated on other grounds by* Harris

No. 1-04-0588

v. Harris, 196 Ill. App. 3d 815, 555 N.E.2d 10 (1990).

Our review of the foregoing cases indicates that, indeed, there appears to be a conflict of authority as to this issue. However, the cases cited by Trossman involve exceptions to the general rule that an evidentiary hearing should be held. In Amadeo, the nonmovant objected to the reasonableness of the fees and costs, which were listed in itemized billing statements. The trial court considered those objections and ruled on the reasonableness of the fees "line by line." This court held that, under the circumstances, the nonmovant "was given a sufficient opportunity to be heard." Amadeo, 299 Ill. App. 3d at 704, 701 N.E.2d at 1145. In both Carr and Aroonsakul, the fee petitions were supported by affidavits of the attorneys, which were unrebutted by the opposing party. See Carr, 283 Ill. App. 3d at 481, 670 N.E.2d at 820; Aroonsakul, 155 Ill. App. 3d at 229, 507 N.E.2d at 5. Finally, Raintree was an appeal from the decision of the Illinois Human Rights Commission, and the petition for attorney fees in that case was governed by the Commission's rules. Raintree, 173 Ill. 2d at 494, 672 N.E.2d at 1147-48. The supreme court in Raintree, further noted that, in general, the circuit court may award attorney fees and costs without an evidentiary hearing if the petition was supported by sufficiently detailed submissions, so long as the opponent was not denied opportunity to present evidence.

However, in Schulson, which, of the authorities cited, offers the most comprehensive treatment of this issue, this court distinguished Raintree and held that when the nonmovant asks for an evidentiary hearing, provided there exists a genuine factual dispute as to the reasonableness of the fees and costs, he is entitled to one:

"Defendants argue that the fees should not have been awarded without an

55

evidentiary hearing ***.

The bank responds that attorney fees may be awarded without an evidentiary hearing when affidavits and detailed billing sheets are submitted to the trial court. The bank relies on Raintree Health Care Center v. Illinois Human Rights Comm'n, 173 Ill. 2d 469, 494, 672 N.E.2d 1136 (1996). Raintree is not on point. In Raintree, our supreme court reviewed attorney fees awarded by an administrative law judge for the Human Rights Commission. The court acknowledged that, under some circumstances, attorney fees may be calculated without an evidentiary hearing. But the issue in Raintree was governed by the Commission's rules, which did not require an evidentiary hearing. Raintree, 173 Ill. 2d at 494.

Defendants presented detailed objections to the fee petition and a written request for a hearing. The reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue. Fried v. Barad, 187 Ill. App. 3d 1024, 1030, 543 N.E.2d 101 (1989); 6334 North Sheridan Condominium Ass'n v. Ruehle, 157 Ill. App. 3d 829, 834, 510 N.E.2d 975 (1987). When a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one. In re Support of Burks, 100 Ill. App. 3d 700, 706, 427 N.E.2d 953 (1981); People ex rel. Holland v. DeMichael, 79 Ill. App. 3d 974, 981, 398 N.E.2d 1138 (1979)." Schulson, 305 Ill. App. 3d at 952, 714 N.E.2d at 28.

We believe that, generally, in protracted litigation involving multiple complex issues, an evidentiary hearing should be conducted upon the request of the losing party, especially if the prevailing party was represented by multiple attorneys—which may have resulted in duplicative charges—and where the prevailing party was entitled to fees and costs with respect to some claims, but not others.  Trossman, relying on Berlak v. Villa Scalabrini Home for the Aged, Inc., 284 Ill. App. 3d 231, 238, 671 N.E.2d 768 (1996), counters that where a party is entitled to fees and costs with respect to some claims and not others, the party may recover fees expended even with respect to noncovered claims, so long as those claims arise out of a common core of facts and related legal theories.  In Berlak, however, the circuit court held an "extensive" hearing on the fee petition.  Berlak, 284 Ill. App. 3d at 242.  Trossman further cites to Hensley v. Eckerhart, 461 U.S. 424, 435, 76 L. Ed. 2d 40, 51-52, 103 S. Ct. 1933, 1940 (1983), where the Supreme Court stated that, where fees were incurred for both covered and non-covered claims, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."  However, the Supreme Court in Hensley qualified that statement, explaining:

"In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories.  In such a suit, even where the claims are brought against the same defendant *** counsel's work on one claim will be unrelated to his work on another claim.  Accordingly, work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.' "  Hensley, 461 U.S. at 434-35, 76 L. Ed. 2d at 51,

57

103 S. Ct. at 1940, quoting <u>Davis v. County of Los Angeles</u>, No. 73-63-WPC

(C.D. Cal. 1974).

Thus, contrary to Trossman's assertion, the Supreme Court did not suggest that, in such a situation, a court may make its determination in a summary fashion. Rather, the decision in <u>Hensley</u> indicates the opposite—that fee determinations in complex cases should only be made after careful weighing of all pertinent evidence. We have reviewed the contentions of the parties, as well as the record, with respect to the fees awarded to Trossman and note that Trossman's attorney fees and costs have exceeded those of counterplaintiffs by more than a factor of four, which further underscores the need for an evidentiary hearing.

For the reasons set forth above, we affirm the judgment of the circuit court with respect to the counterclaim of counterplaintiffs for contribution, and remand for further proceedings with respect to the award of attorneys fees.

Affirmed in part and remanded in part.[16]

CAHILL, J., and FITZGERALD SMITH, P.J., concur.

---

[16]After the original opinion in this cause was issued, a petition for rehearing was filed. One of the members of the original panel, who concurred in the original opinion was compelled to recuse because of an intervening event which occurred after the original opinion was issued and Justice Fitzgerald Smith was designated to substitute. He has read the original opinion, along with the record, briefs, petition for rehearing, and all other submissions of the parties as well as listened to the tape of the oral argument.